State of ARIZONA, Plaintiff–Appellee,

v.

Dennis JOHNSON, Defendant–Appellant.

No. 02–10285.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 13, 2003.

Filed Dec. 16, 2003.

William J. Kirchner, Law Offices of Walter B. Nash, Tucson, AZ, for the defendant-appellant.

David Paul Flannigan, United States Attorney's Office, Tucson, AZ, for the plaintiff-appellee.

Before D.W. NELSON and W. FLETCHER, Circuit Judges, and ALSUP,* District Judge.

WILLIAM A. FLETCHER, Circuit Judge.

United States Border Patrol Agent Dennis Johnson timely appeals his convictions for sexual assault and kidnapping. We affirm, holding that the district court: (1) did not abuse its discretion in answering a question from the jury during its deliberations; (2) did not abuse its discretion in admitting testimony of prior consistent statements under Federal Rule of Evidence 801(d)(1)(B); (3) properly rejected a Sixth Amendment claim that the government had acted in bad faith in deporting aliens who might have been material witnesses; and (4) properly refused to dismiss the kidnapping charge as unsupported by the evidence.

## I. Background

Blanca Amaya–Flores, a citizen of El Salvador, testified that she entered the United States illegally on September 28, 2000, with a group of five men. They crossed the border on foot at an unspecified location near Douglas, Arizona, and then obtained a car. After driving for about thirty minutes, they were stopped by the United States Border Patrol in Tombstone, Arizona. Agent Sandi Goldhamer, Agent–in–Training Daniel McClafferty, and defendant Johnson, the acting supervisor that night, were involved in the stop.

Agent Goldhamer questioned members of the group. She had Agent–in–Training McClafferty fill out an I–620 ("towing sheet") form for the group's car, and she filled out an I–826 form for Amaya–Flores. An I–826 form records an alien's name and biographical information, as well as the date and location of apprehension. Agent Goldhamer then gave the completed forms to Johnson. Amaya–Flores's I–826 form was later retrieved from among Johnson's possessions. Johnson took Amaya–Flores aside and questioned her out of the hearing of the others. After questioning her, Johnson instructed Amaya–Flores to get in the back of his patrol car.

The others in Amaya–Flores's group were placed in Border Patrol SUVs and taken to a border patrol checkpoint at Douglas. Amaya–Flores remained in Johnson's car. Agent Goldhamer testified that it was "unusual" for her to have re-

* The Honorable William Alsup, United States District Judge for the Northern District of California, sitting by designation.

mained in Johnson's car. She further testified that if she had realized that Amaya–Flores was in Johnson's car, she would have made room for her in one of the SUVs.

According to established Border Patrol procedures, Johnson was required to call in a "10–97" to announce that he was a male agent transporting a female. Johnson made no 10–97 call. He drove to a Circle K gas station and bought a cup of coffee and then drove to the Douglas checkpoint. When he arrived, there was a bus holding about twenty-five people whom the Border Patrol were preparing for voluntary return to Mexico. Johnson testified that he told other Border Patrol agents at the checkpoint to load the bus and "get the one from my vehicle and take them all down to the [Douglas ] station." However, Amaya–Flores was never loaded onto the bus. She testified that she sat in the car at the checkpoint for somewhere between an hour and an hour and a half.

Johnson drove away from the Douglas checkpoint with Amaya–Flores still in the car. He testified that she tapped on the plexiglass divider and asked him to release her, and then, when he refused, that she offered to perform oral sex in return for her release. Amaya–Flores testified that she did not speak to Johnson during the car ride. Johnson drove to an isolated spot in the desert near Tombstone, not far from where he had apprehended Amaya–Flores. At trial, Amaya–Flores and Johnson offered conflicting stories of what next occurred.

Amaya–Flores testified that after Johnson stopped the car, he opened her door and told her to take off her clothes. When she was naked except for her socks, Johnson told her to get out of the car. Johnson then handcuffed Amaya–Flores's hands behind her back and told her to get onto her knees. Amaya–Flores testified that he told her that he would leave her in the desert if she did not perform oral sex. She testified that she was crying and that Johnson physically forced her to perform oral sex by pulling her hair and moving her head back and forth. She further testified that Johnson ejaculated in her mouth, and that she spit out the semen onto her legs. When she got dressed, some of the semen was transferred to the inside of her pants. A later DNA test identified the semen as that of Johnson.

Johnson testified that the oral sex was consensual. He testified that Amaya–Flores removed her clothes, but he maintained that he did not ask her to do so. He stated that he handcuffed her hands behind her back, and that he did so because he "didn't trust her." Johnson testified that he is 6'1" and weighs 220 pounds, and he estimated that Amaya–Flores is 5'5" and weighs 120 pounds. Johnson agreed that Amaya–Flores knelt naked in the desert to perform the oral sex, but testified that she did so voluntarily. He testified that she made "a sound that might have been a cry," but he specifically denied that he pulled Amaya–Flores's hair or held her head.

Rather than take Amaya–Flores back to the Douglas station where he was assigned, Johnson drove her to the border crossing at Naco, Arizona, about twenty-five miles west of Douglas. He testified that he let her out of the car about two blocks from the border crossing and told her which way to go. The Mexican border official detected that Amaya–Flores had an El Salvadoran accent and called the United States Border Patrol. Amaya–Flores testified that she told the Mexican official, "I didn't want to go back to the people from Immigration because I felt a great fear with them."

Agent Daniel Testa testified that he received the call from the Mexican official at

Naco to get a "kickback" at approximately 4:00 a.m. Agent Testa transported Amaya–Flores back to the Border Patrol office in Naco and entered her into the IDENT/ENFORCE system in order to see "who caught her the first time, how long ago." There was no record of Amaya–Flores in the system. At about 6:00 a.m., Agent Jose Proenca, a native Spanish speaker, spoke with Amaya–Flores. She described the events of the evening to him, including the oral sex with Johnson, consistently with her trial testimony recounted above. A day later, Agent Ricky Mauldin showed Agent Goldhamer a picture of Amaya–Flores. She recognized Amaya–Flores immediately, recalled filling out her I–826 form, and stated that she had seen Johnson talking with her.

Agent Maudlin and Cochise County Investigator Vince Madrid interviewed Johnson on October 2nd, three days after Amaya–Flores was "kicked back" from Naco. According to a transcript of the interview introduced into evidence, Johnson at first said that Amaya–Flores had been placed on the bus with the other voluntary returnees. Investigator Madrid warned Johnson that he was "catching" him in "a couple of things." Johnson then changed his story and admitted that he had driven with Amaya–Flores to the Circle K for coffee and then to the Douglas checkpoint, and that he had dropped her off at the Naco border crossing. After Agent Mauldin told Johnson that there was "physical evidence," Johnson changed his story again and finally admitted that Amaya–Flores had performed oral sex on him, but insisted that it was at her instigation, stating, "I allowed her to convince me to do something I shouldn't have."

Johnson was charged with sexual assault and kidnapping in violation of Arizona Revised Statutes §§ 13–1406(A) and 13–1304(A)(3). As a federal officer, he re-moved the action to federal district court pursuant to 28 U.S.C. § 1442(a)(1). The trial was therefore conducted pursuant to federal procedural rules and Arizona substantive criminal law. *See Arizona v. Manypenny,* 451 U.S. 232, 241, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981). Johnson was convicted of both counts after a five-day jury trial. He was sentenced to concurrent prison terms of seven years on the sexual assault count and five years on the kidnapping count.

Johnson timely appealed. We affirm the district court in all respects.

## II. Discussion

### A. Response to Jury Question

■ During deliberations, the jury sent out a written question asking, "Is someone in custody of a law enforcement officer able to give consent under the law?" The court asked counsel to suggest answers. Defense counsel responded, "[J]udge, it's a simple answer[. T]he answer is yes.... I think it should be answered and then direct them to the jury instructions." Government counsel responded, "Just rely on the evidence presented and the instructions you gave them." The court then said to counsel:

> What I propose to do is say you're to rely on the instructions and evidence you already have. If I tell them yes, you get more complicated and more questions.
>
> . . .
>
> I'm going to say, "Please consider the instructions you've gotten so far" and see if they come up with any more questions. If they do, we may address it differently, but we'll see if they have any more questions.

The court wrote at the bottom of the paper on which the question was written, "Please consider all the evidence and the instruc-

tions you have been given," followed by his initials. The paper, containing both the question and the court's answer, was then given to the jury. After further deliberation, the jury returned a guilty verdict on both counts.

At trial, Johnson had requested the following jury instructions:

> In order to prove lack of consent, the State must prove beyond a reasonable doubt that Blanca Amaya–Flores was coerced by the immediate use or threatened use of force against her person or property.
>
> . . .
>
> Restrain means to restrict a person's movements without consent, without legal authority, and in a manner which interferes substantially with a person's liberty, by either moving such person from one place to another or by confining such person. Restraint is without consent if it is accomplished by physical force, intimidation or deception.

With respect to "restrain" and "restraint" (the second requested paragraph), the court gave precisely the instruction requested by Johnson. Arizona law does not define consent, but rather gives examples of non-consent. *See* Ariz.Rev.Stat. § 13–1401; *State v. Witwer*, 175 Ariz. 305, 856 P.2d 1183, 1185–86 (Ct.App.1993). The court therefore gave a different instruction than that requested by Johnson with respect to lack of consent (the first requested paragraph). Its instruction was:

> The State must prove beyond a reasonable doubt that the Defendant knew that his conduct was without the consent of Blanca Amaya–Flores.
>
> . . .
>
> The crime of sexual assault requires proof that the defendant intentionally or knowingly had oral sexual contact with another person without the other per-

son's consent by causing her to place his penis in her mouth.

> Without consent includes the following situations:
>
> 1. The victim was coerced by the immediate or threatened use of force against a person or property; and
>
> 2. Without consent also includes when the victim expresses non-consent verbally.

Although he had asked for a different instruction on lack of consent, Johnson did not object to the instruction as it was given. Johnson argues, however, that by giving the jury a non-exclusive list of examples of what "without consent" includes, the instructions left open the possibility that "without consent" might also include any purported consent given by someone in the custody of a law enforcement officer. That is, the instructions left open the possibility that anything done by a law enforcement officer to a person in custody is necessarily done "without consent." Because that possibility was left open, Johnson argues that once the jury asked whether someone in custody of a law enforcement officer is "able to give consent under the law" the district court was required to answer "yes."

■ Johnson argues that the district court erred in failing to give his requested response to the jury's question. We review the district court's response to a jury question for abuse of discretion. *United States v. Romero–Avila*, 210 F.3d 1017, 1024 (9th Cir.2000). We find no abuse of discretion.

At the outset, we observe that the district court's instructions accurately stated Arizona law. Therefore, this is not a case where the trial court erred by giving a supplementary jury instruction that was "simply wrong." *Bollenbach v. United States*, 326 U.S. 607, 613, 66 S.Ct. 402, 90 L.Ed. 350 (1946); *see also Weeks v. Ange-*

*lone,* 528 U.S. 225, 231, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) ("the instruction given by the trial court in *Bollenbach* was palpably erroneous"). Nor is it a case where the instructions were "erroneous, misleading and contradictory." *United States v. Petersen,* 513 F.2d 1133, 1135 (9th Cir. 1975).

■ Moreover, a trial judge, as "governor of the trial," *Quercia v. United States,* 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), enjoys "wide discretion in the matter of charging the jury." *Charlton v. Kelly,* 156 F. 433, 438 (9th Cir.1907); *see also, e.g., Gilbrook v. City of Westminster,* 177 F.3d 839, 860 (9th Cir.1999), *cert. denied,* 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999) (trial judges have "substantial latitude in tailoring jury instructions"). This "wide discretion" carries over to a trial judge's response to a question from the jury. *See Allen v. United States,* 186 F.2d 439, 444 (9th Cir.1951) ("the giving of additional instructions has always been held to be within the discretion of the trial court").

■ Therefore, while it is certainly true that "[w]hen a jury makes explicit its difficulties" by, for example, asking a question, the trial court "should clear [the jury's difficulties] away with concrete accuracy," *Bollenbach,* 326 U.S. at 612–13, 66 S.Ct. 402, the precise manner by which the court fulfills this obligation is a matter committed to its discretion. *Wilson v. United States,* 422 F.2d 1303, 1304 (9th Cir.1970) ("The necessity, extent and character of additional instructions are matters within the sound discretion of the trial court."). In *United States v. Walker,* we explained the rationale behind this broad grant of discretion:

> We are aware that the trial court faces a difficult task in attempting to respond to a jury's communication. A trial judge is often reluctant to respond to questions in language similar to that used by the jury, *particularly where inquiries are phrased as hypothetical cases or as questions requiring a categorical yes or no answer. Questions or illustrations from the jury may be phrased so that a simple affirmative or negative response might favor one party's position, place undue weight on certain evidence, or indicate that the trial judge believes certain facts to be true when such matters should properly be determined by the jury.* Because the jury may not enlist the court as its partner in the factfinding process, the trial judge must proceed circumspectly in responding to inquiries from the jury. The court may properly attempt to avoid intrusion on the jury's deliberations by framing responses in terms of supplemental instructions rather than following precisely the form of question asked by the jury.

575 F.2d 209, 214 (9th Cir.1978) (emphasis supplied); *see also United States v. Nunez,* 889 F.2d 1564, 1569 (6th Cir.1989) (while a trial court "must respond to questions concerning important legal issues," it "must be careful not to invade the jury's province as fact-finder"); *United States v. Ellis,* 121 F.3d 908, 925 (4th Cir.1997) (following *Nunez* ); *United States v. Blumberg,* 961 F.2d 787, 790 (8th Cir.1992) (same).

In this case, Johnson's counsel requested a "categorical yes ... answer" to the jury's question regarding consent. *Walker,* 575 F.2d at 214. The district court, however, was understandably hesitant to grant his request to answer with a simple "yes." Such an answer—while analytically correct—may well have led some jurors to place undue emphasis on the court's answer and to conclude not only that someone in custody can legally give consent, but perhaps also to conclude or suspect that the presiding judge believed that Amaya–

Flores consented in this case. *See Bollenbach*, 326 U.S. at 612, 66 S.Ct. 402 ("The influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are ever watchful of the words that fall from him. Particularly in a criminal trial, the judge's last word is apt to be the decisive word.") (citation and internal quotation marks omitted). Moreover, as Johnson was tried under an Arizona statute that defines consent through examples of non-consent, the judge may properly have been concerned about defining consent in any other manner, lest he misstate Arizona law as enacted by the Arizona legislature and construed by the Arizona courts. *Cf. Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ("state courts are the ultimate expositors of state law").

While the district court's response in this case was clearly not the only course available, the court acted within its discretion by simply referring the jury to the instructions they had already been given. *See United States v. McCall*, 592 F.2d 1066, 1068–69 (9th Cir.1979) (where the district court's original instructions were a correct statement of the law and "generally addressed the jury's question, without specifically providing a yes or no answer," the court's re-reading of its original instructions in response to the question was not reversible error); *United States v. Collom*, 614 F.2d 624, 631 (9th Cir.1979) (where a deliberating jury asked, "[Does] aiding and abetting after the fact constitute a violation of the law?," and the district court, in response, "reinstructed the jury on the elements of aiding and abetting, and ... specifically invited them to ask further questions should the need arise," the court "acted well within [its] discretion"); *Wilson v. United States*, 422 F.2d 1303, 1303–04 (9th Cir.1970) (district court acted within its discretion where, after re-reading a portion of its instructions in response to a written request, and re-reading a relevant statute in response to an oral request, declined another oral request to re-read another portion of its instructions, but invited the jury to resubmit the question if necessary); *Davis v. Greer*, 675 F.2d 141, 145–46 (7th Cir.1982) (where the "entire jury charge clearly and correctly stated the controlling law," and the trial court responded to a jury question by saying only, "Consider all of the instructions carefully," the "trial court's response was sufficiently specific to clarify the jury's confusion") (alluding to *Bollenbach's* requirement that the "judge has a duty to respond to the jury's request with sufficient specificity to clarify the jury's problem," 326 U.S. at 612, 66 S.Ct. 402).

We do not regard our conclusion that the district court acted within its discretion as conflicting with our decision in *Powell v. United States*, 347 F.2d 156 (9th Cir.1965), with the Supreme Court's recent decision in *Weeks v. Angelone*, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), or with our still more recent decision in *Beardslee v. Woodford*, 327 F.3d 799 (9th Cir.2003).

In *Powell*, a federal criminal defendant was charged with "transporting a girl" from Texas to Arizona "for purposes of prostitution." 347 F.2d at 157. The district court properly instructed the jury. After four and one-half hours of deliberation, the jury sent out a somewhat opaque question asking when the defendant's improper purpose had to be formed. The district court responded, "It [the question] just doesn't make sense to me, but here is the instruction I gave you, which I will reread to you." *Id.* The court then read to the jury the part of the previously-given instructions that it thought most responsive to the question. The jury returned a guilty verdict five minutes later. *Id.*

We reversed, holding that the court might have misunderstood the jury's question, and that, by reading only a part of the original instructions, the court might have misled the jury:

> The meaning of the jury's inquiry was uncertain.... [I]t would seem just as likely that the jury meant to ask whether the defendant would be guilty of the offense charged if the wrongful intent were first conceived after the couple arrived at their destination. ... Thus, the court's response may have led to the application of a standard which was wholly improper.

*Id.* Unlike in *Powell*, where the court responded by reading only a part—possibly the wrong part—of the original instructions, the court in this case directed the jury back to the totality of the instructions it had been given. We do not believe that the most appropriate response is always to refer the jury to the totality of the instructions. Indeed, in many cases, it will be by far the better course to direct the jury's attention to the particular instruction that bears on the question. In *Powell*, however, the district court may have misunderstood the jury's question and therefore responded too narrowly. Far from conflicting with our decision in this case, *Powell* supports it, for our analysis in *Powell* strongly suggests that the district court there would not have erred if it had simply directed the jury's attention to the totality of the instructions.

In *Weeks*, a state court jury was properly instructed at the penalty phase of a capital trial. The instruction read, in pertinent part:

> If you find from the evidence that the Commonwealth has proved, beyond a reasonable doubt, either of the two alternatives, and as to that alternative, you are unanimous, then you may fix the punishment of the defendant at death, or if you believe from all the evidence that the death penalty is not justified, then you shall fix the imprisonment of the defendant at imprisonment for life, or imprisonment for life with a fine not to exceed $100,000.

528 U.S. at 229, 120 S.Ct. 727. In the afternoon of the second day of deliberations, the jury sent out the following question:

> If we believe that Lonnie Weeks, Jr. is guilty of at least 1 of the alternatives, then is it our duty as a jury to *issue* the death penalty? Or must we *decide* even though he is guilty of one of the alternatives whether or not to issue the death penalty, or one of the life sentences? What is the Rule? Please clarify?

*Id.* (emphasis in original).

The trial judge stated to counsel, "I don't believe I can answer the question any clearer than the instruction...." *Id.* He therefore simply referred the jury to the already-given instruction. Defense counsel objected, requesting the judge to instruct the jury specifically that even if they find one or both aggravating circumstances, "they still may impose a life sentence, or a life sentence plus a fine." *Id.* at 230, 120 S.Ct. 727. The Supreme Court held in the circumstances of that case that the due process clause of the Constitution did not require the judge to do more than direct the jury's attention "to the precise paragraph of the constitutionally adequate instruction." *Id.* at 234, 120 S.Ct. 727.

In *Beardslee*, a state court jury was properly instructed at the guilt phase of a capital trial. Near the end of the first day of deliberations, the jury sent out a question asking "whether 'the first degree murder' referred to 'the act as a whole or the defendant's participation in said act.'" 327 F.3d at 812. The judge responded the next morning:

Ladies and Gentlemen, also in addition to your request concerning an instruction, there is and can be no explanation of the instructions. You just have to work them out as they are printed.... You are going to have to consider the instructions as a whole, as one of those instructions will be and did advise you, some of the instructions will apply, some of the instructions will not. All of those instructions have to be considered as a whole. Do the best you can with them.

*Id.* The jury returned a guilty verdict that afternoon.

We reversed, holding that the judge's response violated the defendant's due process right to a fair trial. *Id.* at 813. We reasoned that the judge's response was not only a refusal to answer the jury's question, but tantamount to an instruction to not ask again. *Id.* ("Given the categorical nature of the admonition that there 'is and can be no explanation of the instructions,' we disagree with the district court's conclusion that 'the jury was not precluded from asking additional questions if it so desired.' ").

As habeas cases arising out of state criminal trials, *Weeks* and *Beardslee* are based on the due process clause of the Constitution. By contrast, the case before us arises out of a federal criminal trial where we exercise supervisory power as well as enforce the due process clause. *Compare Smith v. Phillips,* 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."), *with McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943) ("the scope of our reviewing power over convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity"). We take it as a given that an action by a district court can be consistent with the due process clause but nonetheless improper and reversible under the federal supervisory power. *Weeks* and *Beardslee* are nevertheless instructive for they draw the outer constitutional boundary of what a court may do in response to a jury's questions. If the district court transgressed the due process line drawn in *Weeks* and *Beardslee,* it necessarily transgressed the boundary we police under our supervisory power.

We find this case comfortably within the boundary drawn by *Weeks* and *Beardslee.* In *Weeks,* the court emphasized not only that the original instruction was proper and that the jury's attention was directed to the appropriate portion of the instruction, but also that the jury would have felt free to ask again if it had felt the need to do so: "This particular jury demonstrated that it was not too shy to ask questions, suggesting that it would have asked another if it felt the judge's response unsatisfactory." 528 U.S. at 235–36, 120 S.Ct. 727. In *Beardslee,* by contrast, we emphasized that the trial judge, in effect, said that he would not answer any more questions and directed the jury not to ask. 327 F.3d at 813.

In the case before us, the district court did not direct the jury's attention to the specific relevant paragraphs of the instruction as in *Weeks,* but there was no need to do so. The jury's question clearly arose out of those paragraphs, and they obviously would have understood the judge's answer as referring to them. In addition, it is relatively clear that the jury in this case was not inhibited from asking further questions. In its answer, the district court said nothing to indicate that it would not answer another, or a renewed, question. That the district court was not incorrect to anticipate the possibility of more jury questions is supported by the court's pat-

tern during the trial: At the end of each witness's testimony, the court had solicited additional questions, in writing, from the jury. After screening them for propriety, the court then asked the jury's questions before excusing the witness. In these circumstances, we cannot conclude that the jury would have construed the court's direction that they consult the instructions as, in addition, a direction that they not ask again. In sum, the district court's response was well within the bounds of the Constitution, and was a permissible exercise of discretion.

### B. Statements Claimed to be Hearsay

■ The government sought to present testimony by Agent Proenca recounting statements Amaya–Flores made to him asserting that she had not consented to the oral sex with Johnson. Johnson objected to this testimony as hearsay. The district court overruled the objection and allowed the testimony. Although neither Johnson nor the district court referred to any particular rule of evidence, it is obvious that the district court relied on Federal Rule of Evidence 801(d)(1)(B), which under certain circumstances defines prior consistent statements as nonhearsay.

■ We review de novo a district court's construction of the hearsay rule. *United States v. Gilbert,* 57 F.3d 709, 711 (9th Cir.1995). We have not previously addressed the standard under which we review a district court's determination of when a person's motive to testify falsely arose within the meaning of Rule 801(d)(1)(B). Although the question of when a motive arose is an issue of fact, ordinarily reviewed under the clearly erroneous standard, *United States v. Percy,* 250 F.3d 720, 725 (9th Cir.2001), we join our sister circuits and hold that we review a district court's determination of admissibility under Rule 801(d)(1)(B) for abuse of

discretion. *See United States v. Prieto,* 232 F.3d 816, 819, 822 (11th Cir.2000); *United States v. Roach,* 164 F.3d 403, 411 (8th Cir.1998); *United States v. Fulford,* 980 F.2d 1110, 1114 (7th Cir.1992); *see also United States v. Hernandez–Herrera,* 273 F.3d 1213, 1217 (9th Cir.2001) (holding that the admission of evidence under an "exception to the hearsay rule" is reviewed for abuse of discretion).

Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Agent Proenca's testimony that Amaya–Flores told him that she had not consented to the oral sex would ordinarily fall within the scope of Rule 801(c) because Amaya–Flores's out-of-court statement to Agent Proenca was offered for the truth of the matter asserted. Rule 801(d), however, excludes certain statements from the definition of hearsay. Because statements that qualify under Rule 801(d) are defined as nonhearsay, they are admissible as substantive evidence.

■ Rule 801(d)(1)(B) provides:

A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

In *Tome v. United States,* the Supreme Court construed narrowly the exception to the hearsay rule embodied in Rule 801(d)(1)(B), holding that "[t]he Rule permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those state-

ments were made before the charged recent fabrication or improper influence or motive." 513 U.S. 150, 167, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995). Following *Tome*, we have characterized the requirements of Rule 801(d)(1)(B) as follows:

> (1) the declarant must testify at trial and be subject to cross-examination; (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony; (3) the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony; and, (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*United States v. Collicott*, 92 F.3d 973, 979 (9th Cir.1996); *see also United States v. Frederick*, 78 F.3d 1370, 1377 (9th Cir. 1996) (holding that prior consistent statements are admissible under Rule 801(d)(1)(B) "only if offered to rebut a charge of recent fabrication or improper influence or motive").

Johnson contends that Amaya–Flores's statement to Agent Proenca does not meet the fourth requirement of *Collicott's* Rule 801(d)(1)(B) framework. Johnson's defense at trial was that Amaya–Flores had consented to—indeed, had initiated—the oral sex. As part of that defense, he contended that Amaya–Flores fabricated her story because she wanted to stay in the United States for the duration of the investigation and trial. In support of this contention, he pointed, *inter alia*, to testimony by Agent William King that the government had arranged for Amaya–Flores to stay with family members in Texas as long as she was needed to assist in the prosecution of Johnson, and had arranged a permit for her to work as a housekeeper or house cleaner during that time. This charge of recent fabrication

and improper motive on the part of Amaya–Flores is sufficient to trigger Rule 801(d)(1)(B).

Agent Proenca's testimony recounting Amaya–Flores's consistent statements to him can be admitted under the rule only if her statements were made "prior to the time that the supposed motive to falsify arose." *Collicott*, 92 F.3d at 979. Amaya–Flores's statements to Agent Proenca were made at about 6:00 a.m., shortly after Amaya–Flores had been "kicked back" from the Naco border crossing. Johnson contends that Amaya–Flores's "motive to falsify" arose either when the Mexican official refused to allow her to enter Mexico or, at the latest, when Agent Testa picked her up at the Naco crossing. The district court overruled Johnson's objection to Agent Proenca's testimony without referring to Rule 801(d)(1)(B) and without making an explicit finding when Amaya–Flores's "motive to falsify" arose, if indeed she ever had such a motive. But it is clear from the transcript that the court had Rule 801(d)(1)(B) in mind and understood the rule's requirement that Amaya–Flores's statements have been made before her motive arose.

There is ample evidence to support the district court's implicit but clear finding that Amaya–Flores's motive to falsify arose, if it ever arose, after her statements to Agent Proenca. There is no evidence that, at the time she made those statements, Amaya–Flores had been offered any special treatment, or had been told that she could stay in the United States for a sustained period, as a result of her charges against Johnson. There is some evidence that Amaya–Flores was interested in how long the investigation would take, as the following exchange at the end of her questioning by Investigator Madrid shows:

Madrid: Okay, then, thank you very much and we will stop here.

Amaya–Flores: I just have one question. Are you going to continue with this?

Madrid: With the investigation?

Amaya–Flores: Yes.

Madrid: Of course we are, we are going to continue with this.

Amaya–Flores: How long, more or less?

Madrid: I don't know. I couldn't tell you that because I don't know.

But this exchange is weak evidence, at best, to show that Amaya–Flores's statements to Agent Proenca were post-motive. First, the exchange with Investigator Madrid took place a day *after* Amaya–Flores's statements to Agent Proenca. Second, the most plausible reading of the exchange is that Amaya–Flores was simply expressing ordinary curiosity about how long the process would take.

We conclude that the district court did not abuse its discretion in admitting Agent Proenca's testimony based on a finding that Amaya–Flores's statements to him were made "prior to the time that the supposed motive to falsify arose." *Collicott*, 92 F.3d at 979.

### C. Amaya–Flores's Companions

 The Sixth Amendment guarantees a defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. Johnson argues that the government's failure to detain Amaya–Flores's companions as witnesses violated this guarantee and thus warranted the dismissal of the charges against him. We review de novo the district court's denial of Johnson's motion for dismissal based on the government's failure to retain witnesses. *United States v. Armenta*, 69 F.3d 304, 306 (9th Cir.1995).

 "The mere fact that the Government deports [ ] witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 872–73, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Rather, in order to show a violation of the right to compulsory process, a defendant "must make an initial showing that the Government acted in bad faith and that this conduct resulted in prejudice to the defendant's case." *United States v. Dring*, 930 F.2d 687, 693 (9th Cir.1991) (emphasis omitted).

Johnson has not demonstrated bad faith on the part of the government. Under our precedents, in attempting to show bad faith, Johnson could present evidence tending to show either (1) that the government departed from its usual procedures, or (2) that it purposely deported the witnesses to gain an unfair advantage at trial. *See id.* at 695; *cf. California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (finding no constitutional violation because the police acted "in good faith and in accord with their normal practice") (quoting *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961)). He has presented no such evidence. On the night of the sexual assault, Amaya–Flores's companions were returned to Mexico before anyone in the government was aware of the sexual encounter between Johnson and Amaya–Flores. Johnson notes that government records reveal that at least one and possibly two of Amaya–Flores's companions on the night of the sexual assault subsequently re-entered the United States and again were voluntarily returned to Mexico. But there is nothing in the record to indicate either that the government departed from its ordinary procedures in returning these individuals to Mexico following their subse-

quent reentries, or that the government deported these individuals knowing that they might be material witnesses in Johnson's case.

### D. The Kidnapping Charge

Under Arizona law, "[a] person commits kidnapping by knowingly restraining another person with the intent to ... [i]nflict ... a sexual offense on the victim." Ariz.Rev.Stat. § 13–1304. With respect to the kidnapping statute,

> "[r]estrain" means to restrict a person's movements without consent, without legal authority, and in a manner which interferes substantially with such person's liberty, by either moving such person from one place to another or by confining such person.

Ariz.Rev.Stat. § 13–1301(2). Johnson argues that the kidnapping charge should have been dismissed because he "did not 'restrain' Ms. Amaya[-Flores] as the word is defined in § 13–1301(2) because at all relevant times he had 'legal authority,' and indeed an absolute duty, to restrain her." We review de novo the district court's interpretation of Arizona's kidnapping statute. *Salve Regina Coll. v. Russell,* 499 U.S. 225, 239, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

The Arizona Supreme Court has explained that the "legal authority" referred to in the kidnapping statute "implies that behavior is sanctioned by law." *State v. Viramontes,* 163 Ariz. 334, 788 P.2d 67, 71 (1990). As the Arizona Supreme Court is the "ultimate expositor[ ] of [Arizona] law," we are bound by its construction of the statute. *Wilbur,* 421 U.S. at 691, 95 S.Ct. 1881. According to Johnson's own testimony, "of course[it is] not" acceptable Border Patrol behavior "to allow aliens to strip in front of you out in the desert." Johnson further testified that there was "no Border Patrol reason" for him to have

had custody of Amaya–Flores when the oral sex occurred. While Johnson had legal authority to detain Amaya–Flores when she was first apprehended, he had no legal authority to continue to confine her in the back of his patrol car, to drive her to a remote spot in the desert, to handcuff her while she performed oral sex, and then to take her to the Naco border crossing roughly twenty five miles west of his ordinary duty station.

AFFIRMED.