**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JESUS ALVAREZ-ULLOA, AKA Jesse Ulloa, AKA Jesse Alvarez Ulloa,<br>*Defendant-Appellant*. | No. 13-10500<br><br>D.C. No.<br>2:11-cr-2268-NVW-1 |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JESUS ALVAREZ-ULLOA, AKA Jesse A. Ulloa,<br>*Defendant-Appellant*. | No. 13-10501<br><br>D.C .No.<br>4:07-cr-1972-NVW-1<br><br><br>OPINION |

Appeals from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
December 11, 2014—San Francisco California

Filed April 21, 2015

Before: A. Wallace Tashima and Richard A. Paez, Circuit Judges, and Frederic Block, Senior District Judge.[*]

Opinion by Judge Tashima

---

## SUMMARY[**]

### Criminal Law

The panel affirmed a conviction for illegal reentry under 8 U.S.C. § 1326(a), and the district court's order revoking supervised release based on that conviction, in a case in which the defendant contended that the district court erred in rejecting his *Batson* challenges and that a supplemental jury instruction impermissibly coerced the jury and constructively expanded the indictment.

The panel held that the district court erred in failing to reach the third step of the *Batson* framework, where it dispensed with each challenge by determining that the government had asserted facially neutral grounds for its peremptory strikes of three Hispanic individuals in the venire, without evaluating the persuasiveness of the government's facially neutral reason. The panel held, however, that the defendant failed to show purposeful discrimination and that the record does not support such a finding on de novo review.

---

[*] The Honorable Frederic Block, Senior United States District Judge, Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court's supplemental instruction – which clarified that the insanity defense would not apply if, while the defendant was illegally present in the United States, he was sane for a long enough period to have left the country – was substantively correct and not coercive. The panel rejected the defendant's contention that the supplemental jury instruction constituted a constructive amendment of the indictment. The panel wrote that because it is well-established in this circuit that an indictment under § 1326(a) need not specifically denote the duration of a defendant's illegal presence, the indictment provided the defendant with adequate notice that he was being charged with a course of criminal conduct that began when he reentered the United States; and that the supplemental jury instruction was not "distinctly different" from the indictment.

## COUNSEL

Jon M. Sands, Federal Public Defender, Keith J. Hilzendeger (argued), Assistant Federal Public Defender, Phoenix, Arizona, for Defendant-Appellant.

John S. Leonardo, United States Attorney, Mark S. Kokanovich, Deputy Appellate Chief, and Kiyoko Patterson (argued), Assistant United States Attorney, Phoenix Arizona, for Plaintiff-Appellee.

**OPINION**

TASHIMA, Circuit Judge:

Jesus Alvarez-Ulloa ("Ulloa")[1] appeals his conviction for illegal reentry under 8 U.S.C. § 1326(a) and the district court's order revoking his supervised release based on the jury's guilty verdict in the illegal reentry case. During jury selection, Ulloa unsuccessfully challenged three of the government's peremptory strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986). At trial, Ulloa asserted the insanity defense, arguing that as a former boxer he suffered from brain damage that prevented him from understanding the nature of his presence in the United States. After the jury deadlocked, the district court clarified that the insanity defense would not apply if while Ulloa was illegally present in the United States he was sane for a long enough period to have left the country. The jury subsequently returned a guilty verdict.

On appeal, Ulloa contends, first, that the district court erred in rejecting his *Batson* challenges, and, second, that the supplemental instruction impermissibly coerced the jury and constructively expanded the indictment. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

**I.**

Over a period of about twelve years, between approximately 1984 and 1996, Ulloa was first an amateur and

---

[1] Our ordinary convention is to refer to litigants with hyphenated Hispanic surnames by the name appearing first in the hyphenated series. However, because Alvarez-Ulloa uses the second of his two surnames, we adopt that nomenclature here.

later a professional boxer. Although Ulloa was raised and appears to have lived primarily in Arizona, he is a citizen of Mexico, a designation responsible for many of his recent legal problems.

In 2010, Ulloa was removed to Mexico following a conviction for attempted illegal reentry after deportation, in violation of 8 U.S.C. §§ 1326(a), (b)(2). Ulloa subsequently reentered the United States. Local police found and detained Ulloa in October 2011 at a resort in Phoenix after he reportedly attempted to steal a copy of the roster of the Arizona Cardinals.

After concluding that Ulloa was a citizen of Mexico subject to a previous deportation order, the government charged Ulloa with illegal reentry. The indictment charged, in full:

> On or about October 23, 2011, at or near Phoenix, in the District of Arizona, JESUS ALVAREZ-ULLOA, an alien, was found in the United States of America after having been previously denied admission, excluded, deported, and removed from the United States at or near San Ysidro, California, on or about December 17, 2010, and not having obtained the express consent of the Attorney General or the Secretary of Homeland Security to reapply for readmission.

> In violation of Title 8, United States Code, Sections 1326(a) and (b)(1).

During jury selection, Ulloa raised three *Batson* challenges to the government's peremptory strikes. Ulloa alleged that the government's strikes of Panelists 25, 29, and 30 were motivated by impermissible racial discrimination. According to Ulloa's counsel, there were five Hispanic individuals in the venire of thirty-six potential jurors, and the government used three of its seven peremptory strikes on Hispanic individuals.

The district court discussed each of the prospective strikes with the government and Ulloa's counsel.

At the court's prompting, the government first addressed the strike of Panelist 25. The government asserted it struck Panelist 25 because he "was a pre-med major in sports medicine and [had] experience in that area and [was] involved in football, karate, and boxing." Additionally, Panelist 25 had previously attended a pro-immigration reform rally with his mother, which, the government suggested, might indicate potential bias in an immigration-related prosecution.

Panelist 29 was struck, according to the government, because she was a third-year law student and had previously worked for a criminal defense firm. The government contended that this background was "indicative of somebody who would be less trusting of the government in immigration prosecution."

Finally, the government asserted that it struck Panelist 30 because she had a son who had been convicted of armed robbery, and reported other negative experiences with law enforcement officers, including having had her house searched by law enforcement officers while she was not

home.  Although Panelist 30 had also noted positive experiences with police during questioning, the government stated she was struck because of a potential bias against law enforcement.

The court sustained each of the strikes.  Working backwards, the court explained that with respect to Panelist 30:

> [T]he government has articulated a facially neutral ground that is actually well supported by the witness's answers that reflected a negative experience with law enforcement. Now, she also had positive experiences, but it was apparent that she had some continuing sensitivity and feeling.  And so I don't have any difficulty concluding that is a facially neutral ground for exercising the strike.

The court next addressed Panelist 29:

> I find that both articulated grounds are facially neutral.  She's two years out of law school. She's worked in law offices. . . .  I've never been able to get on a jury my whole life. Nobody would let me on because I was a lawyer.  And I didn't take it personally.  But that's accepted wisdom of not having someone on the jury who may be in a position to, A, second guess you and, B, carry perhaps special influence into the deliberations of the jury because of the legal training.  And her involvement in immigration criminal defense certainly suggests a special interest and

> sensitivity that, for purposes of a peremptory challenge, is facially neutral.

The court spent the most time considering the strike of Panelist 25. At one point, it noted that "it's the perception of the prosecutor, not my perception that matters." The court eventually concluded:

> I'm satisfied that whether or not the [rally] was specifically focused on Sheriff Arpaio or just generally focused on pro-immigration, that is a facially neutral ground to exercise the strike because it reflects a very substantial interest in this area of policy that most of us have strong views about this, but the fact that he went to a rally reflects a much higher level of interest. And so all of the objections are overruled.

No further discussion of Ulloa's *Batson* challenges occurred.

At trial Ulloa stipulated that he had been found on or about October 23, 2011, in Phoenix, noting that it would be "surprising" if the government failed to prove the elements of illegal reentry. Ulloa intended to build his case on the insanity defense, alleging that, due to injuries he sustained during his career as a professional boxer, he was unable to understand the wrongfulness of his actions. The government presented evidence that Ulloa had been previously deported and was found in the United States in October 2011, and evidence suggesting that Ulloa did not have a mental disease or defect. Ulloa presented evidence suggesting that he in fact suffered from chronic traumatic encephalopathy, a disease

which – according to his expert witness – could have rendered him legally insane.

Under the jury instructions, for Ulloa to be found guilty under § 1326(a), the government was required to prove that: (1) Ulloa "was deported from the United States on or about December 17, 2010," (2) Ulloa "voluntarily entered the United States," (3) "after entering the United States, [Ulloa] knew that he was in the United States and knowingly remained," (4) "on or about October 23, 2011, [Ulloa] was found in the United States," and (5) "[Ulloa] was an alien at the time of [his] entry into the United States." The court further instructed that "[a] defendant is insane only if at the time of the crime charged, one, the defendant had a severe mental disease or defect; and two, as a result, the defendant was unable to appreciate the nature and quality or the wrongfulness of his acts."

Several hours after the jury began deliberations, the court received a note from the foreperson, which stated:

> The jury needs clarification on the defendant's mental state needed to consistently meet the, quote, 'insane,' close quote, criteria for the entire time he was here illegally, (from 2010–2011). Specifically, if the defendant had any moments of mental clarity during that time or he was able to appreciate the nature and quality or wrongfulness of his acts, does that negate the defense of insanity?

After consulting with the parties, the court answered the question by referring the jury to the original jury instructions. Thereafter, the jury sent out another note stating:

> We currently seem to be unable to reach a unanimous decision on a verdict and would like some direction from the court on what to do at this point.

The court responded:

> If the Court gives a more specific answer to your previous question, would you wish to continue to deliberate to try to reach a unanimous verdict?

After the jury replied affirmatively, the court provided the jury with the following supplemental instruction in response to its question:

> The insanity defense would be negated if, after entering the United States, the Defendant ceased to be insane for a long enough time that he reasonably could have left the United States, and he then knowingly remained in the United States for that time.

Thirty-seven minutes later, the jury returned a guilty verdict. The district court subsequently sentenced Ulloa to 48 months' imprisonment.

## II.

## A.

We first address Ulloa's contention that the district court improperly rejected his *Batson* challenges. We normally will not set aside a district court's findings under *Batson* unless

clearly erroneous.  *United States v. De Gross*, 960 F.2d 1433, 1442 (9th Cir. 1992).  However, we review *de novo* whether the district court properly applied *Batson*.  *See United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009).

Under *Batson*, "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure."  476 U.S. at 86.  In ruling on a *Batson* challenge, a district court must apply a three-part framework:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003) (citations omitted).

At *Batson*'s third step, "the trial court must decide not only whether the reasons stated are race-neutral, but whether they are relevant to the case, and whether those stated reasons were the prosecutor's genuine reasons for exercising a peremptory strike, rather than pretexts invented to hide purposeful discrimination."  *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).  The trial court "must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Id.* (quoting *Batson*,

476 U.S. at 93). Such evidence may include "the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Miller-El*, 537 U.S. at 339. The court cannot simply accept the prosecutor's reasons as facially neutral and stop there; it must make an explicit determination at the third step. *See Green*, 532 F.3d at 1030–31; *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003).

Here, the district court did not reach the third step of the *Batson* framework. Although it questioned both the government and Ulloa's counsel about the strikes, the court dispensed with each challenge by determining that the government had asserted facially neutral grounds. The court conducted no further analysis after determining that facially neutral grounds existed. At one point, the court noted that "it's the perception of the prosecutor, not my perception that matters." This comment suggests the court believed its responsibility under the *Batson* framework was merely to establish the presence of a facially neutral ground. Yet our precedents specifically require that the court evaluate the persuasiveness of the government's facially neutral reason. *See Green*, 532 F.3d at 1030–31; *Alanis*, 335 F.3d at 969. The district court thus erred in failing to reach *Batson*'s third step.

## B.

Faced with an improper application of the *Batson* framework, we may decide *de novo* whether the government's strikes were motivated by purposeful discrimination. *See Green*, 532 F.3d at 1033; *Alanis*, 335 F.3d at 969 n.5; *see also United States v. Stephens*,

514 F.3d 703, 713 (7th Cir. 2008). Alternatively, we may remand to the district court, either for a factual hearing or for a new trial. *See United States v. Thompson*, 827 F.2d 1254, 1261–62 (9th Cir. 2007); *see also United States v. Kimbrel*, 532 F.3d 461, 469 (6th Cir. 2008); *United States v. Torres-Ramos*, 536 F.3d 542, 561 (6th Cir. 2008). Because the record here is well-developed and there are not outstanding issues that would benefit from an additional hearing long after the original trial, we assess now whether Ulloa proved purposeful discrimination in violation of *Batson*.

Ulloa contends that impermissible racial discrimination inhered in the government's strikes of three prospective jurors: (1) Panelist 25 – a sports enthusiast and former pre-med major who had attended a pro-immigration rally; (2) Panelist 29 – a student at a local law school who had worked in criminal defense; and (3) Panelist 30 – a woman who described negative experiences with law enforcement, including a police raid on her property. Each of these prospective jurors was Hispanic.

Ulloa has made out a prima facie case under step one of *Batson* that each of these strikes was based on purposeful racial discrimination. To make out a prima facie case, a defendant must show only "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. at 93–94; *see Johnson v. California*, 545 U.S. 162, 173 (2005) (concluding that *Batson*'s first step is not a "more likely than not" standard). The challenges here meet that modest bar. Out of a venire of thirty-six potential jurors containing five Hispanic individuals, the government used three of its seven peremptory strikes on Hispanics. Given the racially charged context of this case, the government's striking sixty percent of Hispanic individuals

and approximately eight percent of non-Hispanic individuals is sufficient to ground a prima facie case. *Cf. id*. at 164–65 (concluding that the defendant made out a prima facie case because the prosecution used three of its twelve challenges to strike the only African-American prospective jurors from the venire).

Likewise, the government articulated race neutral justifications for each of the challenged strikes. The government stated that Panelist 25 was struck because his background in sports medicine and apparent interest in immigration policy might have rendered him reluctant to convict a former boxer of an immigration violation. Panelist 29, according to the government, was struck out of concern that her experience in criminal defense might bias her against the government. And Panelist 30 was struck because of the government's concern that an individual who had negative experiences with law enforcement might be biased in favor of a criminal defendant. Each of these purported reasons is race-neutral and has support in the record.

Ulloa's challenges thus turn on step three of the *Batson* framework. In addressing step three, we emphasize that, as the party alleging unconstitutional discrimination, Ulloa bears the ultimate burden. *Yee v. Duncan*, 463 F.3d 893, 895 (9th Cir. 2006). We examine Ulloa's challenges at step three *seriatim*.

First, Panelist 29 – the law student with criminal defense experience. In general, the concern that jurors with legal experience will bias or commandeer a jury is widespread among lawyers, and other courts have accepted it as a persuasive justification at step three of *Batson*. *See United States v. Bolden*, 545 F.3d 609, 613–14 (8th Cir. 2008). More

importantly, there is simply no evidence in the record that the government's concern related to anything other than the panelist's legal background, *i.e.*, that it was pretextual. Ulloa suggests that the government's failure to strike several similarly situated prospective jurors indicates a discriminatory motive. Comparative juror analysis is a useful tool at *Batson* step three, *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005), and failure to strike similarly situated venire members can ground a conclusion that purposeful discrimination occurred, *see Green*, 532 F.3d at 1030. However, Ulloa does not point to any panelists not struck who actually were lawyers or law students, and who would have raised the same concern the government articulated as justification for its strike of Panelist 29. Thus, Ulloa cannot satisfy his burden of showing purposeful racial discrimination.

Second, Panelist 30 – the woman who disclosed negative encounters with law enforcement. This challenge similarly fails. Other courts have indicated that a prospective juror's potential distrust of law enforcement may ground a peremptory strike. *See Edwards v. Roper*, 688 F.3d 449, 455 (8th Cir. 2012). That justification is particularly convincing in a case such as this one, where the prospective juror described deeply traumatic experiences involving law enforcement, including having firearms pointed at her children during a police raid. As with Panelist 29, there is no evidence in the record that the government was concerned about race and Ulloa cannot point to panelists not struck who were situated similarly to Panelist 30. Although several non-Hispanic jurors who were not struck disclosed family members convicted of crimes, none revealed the same kind of traumatic encounter with police as did Panelist 30.

Finally, Panelist 25 – the former sports medicine student who had attended a pro-immigration rally. As with the other challenged strikes, there is no evidence in the record that the government was concerned about this panelist's race. Comparative analysis reveals no similarly situated non-Hispanic jurors who were not struck. Ulloa identifies Panelist 45, who had a close friend involved in boxing, as a similarly situated juror. However, Panelist 45 differed from Panelist 25 in at least two meaningful ways. First, Panelist 45's experience with sports was apparently casual and second-hand, rather than first-hand as part of a course of academic training. Second, Panelist 25 had both a sports background *and* a potential interest in immigration policy, making him a more attractive target for a strike than Panelist 45. Although the government's decision to strike a Hispanic venire member for a purported interest in immigration policy perhaps raises questions about motive, the burden of showing purposeful discrimination rests with Ulloa. In a case, such as this one, where the statistical evidence is not overwhelming and comparative analysis is unhelpful, Ulloa cannot meet that burden.

We hold that, although the district court erred in applying the *Batson* framework, Ulloa failed to show purposeful discrimination, and the record does not support such a finding on de novo review. We therefore reject Ulloa's *Batson* challenges.

## III.

### A.

Ulloa next contends that the district court's supplemental instruction impermissibly coerced the jury's verdict in

violation of the Sixth Amendment. Although we review the decision to give a supplemental jury instruction for abuse of discretion, *see United States v. Solomon*, 825 F.2d 1292, 1295 (9th Cir. 1987), we review *de novo* whether a trial court's actions impermissibly coerced a jury's verdict, *United States v. Williams*, 547 F.3d 1187, 1202 n.14 (9th Cir. 2008).

In resolving Ulloa's challenge, we first examine whether the supplemental instruction was substantively correct. Ulloa was charged with the crime of being "found in" the United States after having been removed, one of "three distinct substantive offenses" under § 1326(a). *United States v. Covian-Sandoval*, 462 F.3d 1090, 1094 (9th Cir. 2006). It is an affirmative defense to any federal crime, including those under § 1326, that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a).

Although we have not had occasion to apply the insanity defense to the "found in" offense under § 1326(a), our precedents offer guidance on how the defense operates. Illegal reentry is a continuing offense, meaning that the offense "commences with the illegal entry, but is not completed until discovery." *United States v. Hernandez-Guerrero*, 633 F.3d 933, 936 (9th Cir. 2011). When a defendant asserts an affirmative defense to a continuing offense, he generally must show that the requirements for the defense were satisfied for the entire period in question. *See United States v. Bailey*, 444 U.S. 394, 412 (1980) (noting that an individual using a duress defense to defend a charge of escape, another continuing offense, "must . . . offer evidence justifying his continued absence from custody as well as his

initial departure"); *see also United States v. Williams*, 791 F.2d 1383, 1388 (9th Cir. 1986). Continuing offenses, by their nature, contemplate extended periods of proscribed criminal conduct. It would be anomalous for a defense that negates culpability for only one portion of a continuing offense's criminal period to completely bar conviction.

The Tenth Circuit dealt with a case which involved a situation similar to the case at bench, in which the defendant asserted duress as a defense to an illegal reentry charge under § 1326(a). *See United States v. Portillo-Vega*, 478 F.3d 1194 (10th Cir. 2007). There, the defendant claimed that he illegally reentered the United States because he feared persecution at the hands of Mexican police. *Id.* at 1198–99. The court reasoned that for the defendant to be entitled to a duress instruction, he needed to adduce evidence to show not only that he reasonably feared death or serious bodily injury when he reentered, but also throughout the duration of his illegal stay. *Id.* at 1201.[2] The logic of *Portillo-Vega* applies with equal force to the insanity defense, which is historically and conceptually analogous to duress. *See Powell v. Texas*, 392 U.S. 514, 535–36 (1968) (plurality opinion). To succeed in his defense, Ulloa thus needed to prove that he was legally insane for virtually the entire duration of his illegal stay, such that he could not reasonably have left the United States. We therefore conclude that the district court's supplemental instruction was substantively correct.

---

[2] Specifically, the court noted that for the duress defense to abrogate culpability under § 1326(a), the defendant must "proffer evidence of a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *Portillo-Vega*, 478 F.3d at 1201 (quoting *Bailey*, 444 U.S. at 415).

**B.**

We next consider whether the supplemental instruction was impermissibly coercive. We evaluate whether a trial court's supplemental charge to a jury was coercive "in its context and under all the circumstances." *Smith v. Curry*, 580 F.3d 1071, 1080 (9th Cir. 2009) (quoting *Lowenfeld v. Phelps*, 484 U.S. 231, 237 (1988)). When a trial court responds to jury questions "every effort must be undertaken to avoid influencing or coercing a jury to reach one verdict over another." *United States v. Evanston*, 651 F.3d 1080, 1084 (9th Cir. 2011). "Extraordinary caution must be exercised when acting to break jury deadlock." *Id.* at 1085. However, the trial court has a responsibility to assist the jury in applying the proper legal standards. When the jury "makes explicit its difficulties by, for example, asking a question, the trial court should clear [the jury's difficulties] away with concrete accuracy." *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13 (1946) (internal quotation marks omitted) (alteration in original)).

In *Smith*, the trial court faced a jury deadlocked as a result of a single holdout. 580 F.3d at 1079. The trial court instructed the jurors to focus on "specific evidence the court thought supported the guilty verdict favored by the majority of jurors." *Id.* at 1082. We held the instruction to be coercive, in part, because "the [trial court's] summary of the evidence was not neutral by any reasonable standard." *Id.* at 1083. By contrast, in *Parker*, a state trial court judge provided additional instructions to a deadlocked jury, encouraging the jurors to "not hesitate to re-examine [their] views" and to experiment with various deliberation strategies. *Parker v. Small*, 665 F.3d 1143, 1145–46 (9th Cir. 2011). We

accepted the California Court of Appeal's conclusion that the trial judge's behavior was not coercive, and distinguished *Smith*, because the trial court did not "attempt to recast the evidence in a light more favorable to the prosecution." *Id.* at 1149; *cf. Johnson*, 351 F.3d at 993 (upholding, under the abuse of discretion standard, a trial court's supplemental instruction defining "consent" in a sexual assault prosecution through "a non-exclusive list of examples of what 'without consent' includes").[3]

Conducting the holistic, contextual inquiry required by our precedents, we conclude that the supplemental instruction in this case was not coercive. Ulloa's central argument is that the supplemental instruction indicated Ulloa's mental defect was of a kind that *could have* relented for long enough to make him aware of the wrongfulness of his presence in the United States, thereby putting a pro-government gloss on the evidence. Contrary to Ulloa's assertion, the supplemental jury instruction did not suggest that Ulloa's mental defect could have relented. Rather, it merely informed the jury that *if* the defect had relented that would be legally dispositive, without betraying a stance on whether the defect had relented. *Cf. Parker*, 665 F.3d at 1149; *Smith*, 580 F.3d at 1083. Moreover, the district court gave the jury the supplemental instruction only after the jury made clear that it did not understand the legal standard and failed to reach a verdict on the original instructions. The supplemental instruction was brief, direct, and does not appear to have been directed at any

---

[3] *Parker*, like *Smith*, arose in the habeas context, requiring that we apply the deferential standard of review prescribed by the AEDPA, 28 U.S.C. § 2254(d). *Parker*, 665 F.3d at 1147. However, our explanation in that case of how the facts at hand differed from those in *Smith* remains persuasive authority.

particular juror.  The district court did not err in giving the supplemental instruction.

## C.

Ulloa also contends that the supplemental jury instruction constituted a constructive amendment of the indictment in violation of the Fifth Amendment.  We review *de novo* whether a constructive amendment took place.  *United States v. Hartz*, 458 F.3d 1011, 1019 (9th Cir. 2006).  A constructive amendment occurs "when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them."  *United States v. Ward*, 747 F.3d 1184, 1189 (9th Cir. 2014) (quoting *United States v. Van Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)); *see also United States v. Dipentino*, 242 F.3d 1090, 1094–95 (9th Cir. 2001); *Howard v. Dagget*, 526 F.2d 1388, 1389–90 (9th Cir. 1975) (per curiam).  For a constructive amendment to inhere, jury instructions must "diverge materially" from the indictment and evidence must have been "introduced at trial that would enable the jury to convict the defendant for conduct with which he was not charged."  *Ward*, 747 F.3d at 1191.  If the possibility exists that "the defendant's conviction could be based on conduct *not* charged in the indictment," then a constitutional violation results because an amendment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment."  *Id.* (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960) (alteration in original)).

For example, in *Howard* we found a constructive amendment where a defendant was indicted for having business relationships with two particular prostitutes, but the trial court's instructions did not "specifically reference the

two women named in the indictment." *Ward*, 747 F.3d at 1190–91 (citing *Howard*, 526 F.2d at 1389). We found a constructive amendment in this circumstance because the government had introduced evidence at trial that the defendant had relationships with various prostitutes aside from the individuals mentioned in the indictment. *Howard*, 526 F.2d at 1389–90.

We have not previously addressed whether a constructive amendment occurs when an indictment for a continuing offense does not specifically mention the duration of that offense. Seizing on this ambiguity, Ulloa argues that because the indictment on which he was tried mentioned only his removal and found-in dates and did not discuss the time between when Ulloa reentered the country and when he was found, the supplemental jury instruction "expand[ed] the temporal scope of the acts that the jurors had to conclude were negated by Mr. Ulloa's insanity defense" and, thus, constituted a constructive amendment.

To resolve Ulloa's challenge, we must determine whether the indictment adequately "presented" the period of time between when Ulloa reentered and when he was found in Phoenix such that his rights were not abridged. *Stirone*, 361 U.S. at 217. We note first that an indictment generally must articulate only "the crime charged," "the essential elements of the indicated crime," and "the acts alleged to constitute the offense in detail sufficient to bring them within the scope of the offense and sufficient to inform the accused generally of the acts attributed to him and the time of their commission." *Elder v. United States*, 142 F.2d 199, 200 (9th Cir. 1944). In the case of the "found in" crime with which Ulloa was charged, those elements are that the defendant: (1) is an alien; (2) had previously been removed; (3) was

subsequently found in the United States; and (4) did not have the permission of the Attorney General to reapply for admission. *See* 8 U.S.C. § 1326(a); *United States v. Parga-Rosas*, 238 F.3d 1209, 1211 (9th Cir. 2001). An indictment for the found in crime need not mention the actual reentry because that concept is "embedded in the 'found in' offense," as must be, by extension, the time spent in the United States between when one reenters and is found. *See United States v. Pacheco-Medina*, 212 F.3d 1162, 1166 (9th Cir. 2000).

Reentry and time spent inside the United States after reentry are embedded within § 1326(a)'s elements because illegal reentry is a continuing offense. *United States v. Hernandez-Guerrero*, 633 F.3d 933, 936 (9th Cir. 2011). Because continuing offenses contemplate conduct which is open-ended in time, we generally do not require the government to mention each day in the charging document. *See United States v. Forrester*, 616 F.3d 929, 941 (9th Cir. 2010) (noting that an indictment for conspiracy identifying the conspiracy's end date need not specify when the conspiracy began); *see also United States v. Spaeni*, 60 F.3d 313, 315 (7th Cir. 1995) ("[O]nly in rare cases is time a material element of a charged offense, even where continuing offenses . . . are alleged.").

Given that the concepts of reentry and illegal presence are embedded in § 1326(a), we conclude that, in this case, no constructive amendment occurred.[4] Because it is well-established in this circuit that an indictment under § 1326(a) need not specifically denote the duration of a defendant's

---

[4] We do not address whether, in the context of a non-continuing offense, an indictment's failure to mention a particular period of time later referenced in jury instructions may give rise to a constructive amendment.

illegal presence, the indictment provided Ulloa with adequate notice that he was being charged with a course of criminal conduct that began when he reentered the United States. The supplemental jury instruction thus was not "distinctly different" from the indictment. *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006); c*f. United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (noting that the touchstone of the constructive amendment inquiry is whether "the defendant was given notice of the '*core of criminality*' to be proven at trial") (quoting *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) (emphasis added)). The indictment and supplemental instruction thus did not deprive Ulloa of any substantive right.

## IV.

For the foregoing reasons, we reject Ulloa's contentions, first, that the government violated *Batson* in exercising its peremptory challenges and, second, that the district court's supplemental jury instruction impermissibly coerced the verdict and constructively expanded the indictment.

The judgment of the district court (No. 13-10500) and the district court's order revoking supervised release (No. 13-10501) are **AFFIRMED**.