**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY BERNARD SMITH, Jr.,
        *Petitioner-Appellee,*

v.

B. CURRY; BILL LOCKYER,
        *Respondents-Appellants.*

No. 07-16875

D.C. No.
CV-03-01871-
LKK/KJM

ANTHONY BERNARD SMITH, Jr.,
        *Petitioner-Appellant,*

v.

B. CURRY; BILL LOCKYER,
        *Respondents-Appellees.*

No. 07-16876

D.C. No.
CV-03-01871-
LKK/KJM

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, District Judge, Presiding

Argued and Submitted
December 10, 2008—San Francisco, California

Filed September 8, 2009

Before: Mary M. Schroeder, Marsha S. Berzon and
N. Randy Smith, Circuit Judges.

Opinion by Judge Schroeder;
Partial Concurrence and Partial Dissent by Judge N.R. Smith

12563

**COUNSEL**

David M. Porter, FD, Sacramento, California, for petition-er/appellee/appellant, Anthony Bernard Smith, Jr.

David A. Eldridge, DOJ, Sacramento, California, for respon-dents/appellants/appellees, B. Curry and Bill Lockyer.

## OPINION

SCHROEDER, Circuit Judge:

Supreme Court precedent spanning more than a century permits a trial judge to instruct a deadlocked jury about its duty to deliberate, but bars the judge from trying to force or coerce a verdict. *See Allen v. United States*, 164 U.S. 492 (1896); *Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Early v. Packer*, 537 U.S. 3 (2002) (per curiam). The district court in this case granted the writ of habeas corpus, because the district court concluded the state trial court violated that rule when the trial judge, having learned who the holdout juror was and the specific evidence that was troubling that juror, instructed the jury to focus on particular evidence supporting conviction. We reach the same conclusion as the district court, and we affirm the grant of habeas relief. We hold that the Court of Appeal's decision upholding the instruction was an unreasonable application of established Supreme Court law.

The petitioner, Anthony Smith, was convicted in Superior Court of Sacramento County, California, of burglarizing the home of an aging couple, robbing them, and forcing oral copulation on the wife. Smith's co-defendant James Hinex was charged with burglary and robbery, but not with the oral copulation count. Smith received a determinate term of twenty years followed by a term of twenty-five years to life.

Evidence at trial included DNA evidence implicating Smith. Smith attempted to discredit this evidence through an expert witness. Other key evidence included the post-arrest statements Smith and Hinex voluntarily gave to the investigating officer after waiving their *Miranda* rights.

On the third day of deliberations, the jury first informed the trial judge it could not reach a verdict on the oral copulation charge. When the jury returned deadlocked a second time, the

court gave a change modeled after an "*Allen* charge." On the fifth day, one of the jurors wrote a note to the judge, explaining he thought the DNA evidence was tainted. The court then, over defense counsel's strenuous objection of coercion, instructed the jury to look at the "consistencies and inconsistencies" between Smith's and Hinex's post arrest statements to the police. The court went on to summarize the statements, and to explain what, in the court's view, were the key portions of those statements the jury should consider. The court made no reference to other relevant evidence bearing on the significance of the consistencies and inconsistencies. The jury returned a guilty verdict against Smith on the copulation charge approximately an hour later.

The California Court of Appeal affirmed the conviction, and the California Supreme Court denied review. Smith filed his first federal habeas petition pro se in 2003, and the district court subsequently appointed counsel. The district court granted relief on the jury coercion claim, but denied relief on Smith's other claims. The state appeals the judgment granting the petition on the jury coercion claim, and Smith cross-appeals the court's denial of his other claims. We affirm in all respects.

## BACKGROUND

The following factual summary of the evidence supporting the verdict is adapted from the opinion of the state appellate court. The victims, Eugene and Deanna S, aged 71 and 56 at the time of trial, lived in Sacramento, California in September 1997, when they visited Reno and won $4,000 gambling. On Saturday, September 6, 1997, the evening of their return, Mrs. S told a former co-worker, Robert McKinsey, of the couple's winnings.

The next afternoon, Sunday, September 7, Mr. S was watching television in the couple's living room. Mrs. S was in the bedroom after washing her hair. When the doorbell

rang, Mr. S opened the front door and saw petitioner Smith, a tall African-American man in a black t-shirt, standing with a folded newspaper. Smith told Mr. S he was soliciting subscriptions, but Mr. S said he was not interested and returned to his couch, leaving the screen door unlocked. Smith followed Mr. S into the house and held a gun to his head, asking where the money was. When Mr. S denied having any money, Smith hit him with his hand and with the gun, and ordered Mr. S to hand over the money.

Seconds later, another African-American male, co-defendant Hinex, entered the house and also demanded money. After Smith threatened to shoot, Mr. S handed over his wallet to Hinex, who took out $8 and pocketed the bills.

Smith then asked Mr. S if his wife was home. Mr. S responded that she might be in the shower or next door, and Smith went to look for her in the bedroom. When Mrs. S heard him coming, she called 911 and hid beside the bed. Smith entered the bedroom and went through the closet and drawers. When he saw Mrs. S, he ordered her to get up. As she stood up from her hiding place, Smith slapped and kicked her and asked if she had called the police. Mrs. S responded that she hadn't had time. Smith then ordered her to take off her clothes, threatening to shoot her if she did not comply. Removing her t-shirt and holding it against herself, Mrs. S told Smith that she had $100 in her wallet. He ordered her to surrender it. Then, putting the gun to her head, Smith forced oral copulation. When he finished, Mrs. S spit the ejaculation from her mouth onto the carpet. At the sound of police sirens, Smith left the room, threatening to come back and kill her.

Meanwhile, in the living room, Hinex menaced Mr. S with a steak knife, took his checkbook and electronic organizer, and then grabbed and dragged him down the hall to the bedroom, where Smith was pulling up his pants after hearing the police sirens. Smith and Hinex then ran out the front door as the first police officer, Officer Johnson, arrived. Johnson was

unable to catch Smith and Hinex, but other officers found Hinex in a yard a few houses down the street. Hinex was immediately arrested and identified by the Ss as the perpetrator in the oral copulation incident.

Detective Willover interviewed Hinex, who named Smith as a participant in the robbery and as the one who had forced oral copulation by Mrs. S. In interviews the next day, Mrs. S tentatively identified Smith from a photo lineup and told Detective Willover about the ejaculate she spit on the carpet. When Detective Willover interviewed Smith on September 12, the day of his arrest, Smith admitted taking part in the burglary, but denied any sexual assault.

Testing of blood, saliva and semen samples of the defendants and the victim excluded Hinex and Mr. S as the donor of the semen on Mrs. S's t-shirt and on the carpet, but did not exclude Smith. DNA testing of the semen and saliva samples from the T-shirt and carpet led the criminologist conducting the testing to conclude that of the three males involved in the case, namely Hinex, Mr. S and Smith, the semen could have come only from Smith. The criminologist relied on statistical methods to calculate that one out of every 1,450 African-Americans, one out of every 19,500 Caucasians, and one out of every 17,500 Latinos would have the same combination of genetic traits found in Smith's DNA and in the sperm sample.

Smith presented testimony at trial from an expert on DNA testing, Dr. Mueller, who called into question the validity of the testing techniques used to link Smith to the semen samples. Dr. Mueller criticized the criminologist's statistical methods and stated that crime labs can produce false positives in DNA tests. Dr. Mueller conceded, however, that the National Academy of Sciences had approved the testing and calculating methods used by the criminologist.

Before trial, a substantial amount of additional evidence regarding the DNA testing methods was presented to the court

during a hearing on Smith's *Kelly-Frye* motion to suppress the criminologist's testing results. *See People v. Kelly*, 549 P.2d 1240 (Cal. 1976); *Frye v. United States*, 293 F.3d 1013 (D.C. Cir. 1923). The jury did not hear that evidence, for it underlay the trial court's decision to admit the DNA evidence incriminating Smith.

Hinex testified at trial that he, Smith and their friends "JB" and Chris McCurin had driven to the S residence on September 7 after McKinsey told them about the Ss' gambling winnings. According to Hinex's trial testimony, McCurin and Smith entered the house, and Hinex saw them through a window holding a man at gunpoint and asking where the money was. Hinex stated that Smith and McCurin then rushed out of the house at the sound of sirens. Hinex was impeached at trial with the inconsistent story he initially told police, in which he had said he and Smith entered the house, and Smith went to the bedroom and forced oral copulation by Mrs. S.

Smith did not testify at trial. In his statement to police officers, Smith admitted taking part in the burglary and robberies, but denied sexually assaulting Mrs. S. He stated that after he and Hinex entered the house, they went to Mrs. S's bedroom together, and that Hinex later took Mrs. S to another room. At trial, the prosecution played for the jury both Hinex's and Smith's taped interviews with Detective Willover.

The jury began deliberations on September 17, 1998. On the third day of deliberation, September 25, it returned guilty verdicts on the first three counts, burglary and two counts of robbery, but was not able to reach a verdict on Count 4, oral copulation. The court asked if there was any hope that further deliberation might result in a verdict, and, after receiving a positive response, sent the jury back to deliberate.

At the end of the day, the jury still had not reached a verdict. The foreperson told the court that one of the jurors wanted to communicate to the judge. The judge said he did

not want to hear about the jurors' "thought processes." The next day, the juror in question, Juror 10, sent a letter to the court stating the following:

> I am unable to vote for a guilty verdict on charge No. 4. My reasons are as follows: I am of the opinion that the methods used in collecting the evidence from which the sole sperm sample (purple shirt) was lifted may have contaminated the evidence because of time lapse and handling procedure. Further, I can not come to the absolute conclusion that the processes and procedures utilized at arriving at the DNA match have proven to be infallible as the only indication of Mr. Smith['s] guilt on this charge.
>
> For me the choices are:
>
>   1.  Was Mrs. S[ ]'s unreliable identification of her attacker credible?
>
>   2.  Did Mr. Smith, according to his statement, admit to the other three charges and only deny the fourth?
>
>   3.  Are the Sacramento County Crime Lab's findings based on the DNA match the only credible evidence on this charge?
>
> Unfortunately, for me, that is not one absolute conclusion on this charge. Therefore, I have a reasonable doubt and in good conscience cannot vote for conviction.

The court then gave the jury an *Allen*-type instruction, over defense counsel's objection on the ground that the instruction would have coercive effect in light of the court's knowledge

of a juror's thought process. The following is the relevant portion of that trial court instruction:

> To assist you in your further deliberations and to address the concerns expressed in [Juror 10's] communication, I am willing to further instruct you in this case as follows.
>
> Your goal as jurors should be to reach a fair and impartial verdict based solely on the evidence presented and without regard for the consequences of your verdict regardless of how long it takes to do so. What your duty as jurors is to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding that evidence and to listen to and consider the views of your fellow jurors.
>
> In the course of your further deliberations, you should not hesitate to reexamine your own views or to request your fellow jurors to reexamine their views. You should not hesitate to change your view once held if you are convinced it is wrong or to suggest other jurors change their views if you are convinced they are wrong. Fair and effective jury deliberations require a frank and forthright exchange of views.
>
> As I previously . . . instructed you, each of you must decide the case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge if you can do so without violence to your individual judgment.

The jury returned to the jury room, but later sent a note that it was still unable to reach agreement. It was at that point that

the judge decided to comment on the evidence to the jury, giving the instruction that is the centerpiece of this appeal. The instruction focused on the "consistencies and inconsistencies" in Hinex's and Smith's statements to Detective Willover. Those statements were inconsistent as to whether Hinex went in the house, but were consistent that Smith did go in. The defense objected to the instruction. Defense counsel expressed respect for the judge, but stated she was persuaded that on this occasion, the judge was improperly commenting on particular evidence, due to his belief that Smith was guilty on the copulation charge. Counsel objected specifically to the judge's commenting on the evidence supporting conviction in light of the juror's expressed doubts about the DNA evidence. Counsel pointed out that the judge had heard a lot of background on the DNA evidence in the pretrial *Kelly-Frye* hearing from which the jury was excluded:

> I'd like to say that I make these comments with great discomfort because of my tremendous respect for this Court. I've had numerous dealings with this Court as my home court judge for a couple of years and . . . I have been impressed with the Court's competence, intellectual honesty and careful, cautious consideration of legal issues.
>
> . . . . I want to point out that the Court, I believe, has a sincerely held belief in the defendant's guilt. It is very clear that that's true. And I submit that the Court is letting that affect its discretion in this matter, and I need to point out that the Court has heard a tremendous amount of evidence with respect to the serology and DNA, specifically, that the jury has not heard.
>
> . . . . So I would request the Court to consider whether its belief in the defendant's guilt is based in part on evidence that is not — that has not been presented by the prosecutor in this case.

. . . . [T]he reason it is so obviously so devastating is because the jury considers the judge the most intelligent lawyer in the courtroom, certainly it is clear in this case they do.

After denying defense counsel's motion for a mistrial, the court instructed the jury as follows:

Ladies and gentlemen, in reviewing the ten communications you have sent to the Court since you began your deliberations on September 18th, 1998, it appears to the Court that the question as to who actually perpetrated forcible oral copulation upon [Mrs. S] is a matter of controversy among you.

You are, of course, the exclusive judges of the facts, and it is your duty, if you can, to arrive at a verdict one way or another. To that end, I am going to exercise the priviledge [sic] that I have under the laws of the state to comment on the evidence, not to impose my will on you in any way, but simply to have you review certain evidence you may not have considered or discussed during your deliberations.

In my view, it is important that you consider the statements defendant Anthony Smith and James Hinex made to law enforcement following their arrests.

Accordingly, after I have completed my comments, I am going to have those statements played in open court. As you listen to their statements, you should read the transcript which you have been provided with that corresponds to the statement you're listening to. When listening to their statements, you should compare their statements against each other. You should listen for consistencies in there [sic] statements as well as inconsistencies. Consistencies

in statements and inconsistencies in statements are proper areas to consider in evaluating evidence.

Among the consistencies and inconsistencies you will hear in James Hinex' statements to Detective Willover, Hinex tells Willover that he and Smith went up to the front door of the S[ ] home. Hinex said Smith pretended to sell the newspaper. Hinex said Smith went inside the house. Hinex denied going inside the house.

In Hinex' statements to Detective Willover and Detective Ware, Hinex said that Smith was the guy who went into the house. Hinex said Christopher [McCurin] was not at the house when the incident occurred. Hinex denied going into the house.

Hinex said Smith went to the back of the house with a gun and closed the door. Hinex said Smith was the only one who ran out of the house. In Smith's statement to Detective Willover, he told Willover he and Hinex went in the front door with a gun. Smith told Willover he and Hinex went to the house and Chris stayed in Rob [McKinsey]'s house. Smith told Willover Chris did not go in the house.

Smith said he and Hinex went inside the house. Smith said that he found Ms. S[ ] in one of the back bedrooms. Smith said he had the gun when he was back there with Mrs. S[ ]. Smith said that Mrs. S[ ] gave him a $100 bill.

There are other consistencies and inconsistencies you will hear in their statements, but these are the most significant in my view.

The court then played the tapes of Hinex's and Smith's statements to detectives. After the tapes were played, the court further instructed:

After making a comparison of the statement of Anthony Smith and James Hinex to law enforcement, consider and discuss how this comparison affects your finding as to who perpetrated the act of forcible oral copulation upon [Mrs. S].

My comments are advisory only and are not binding on you as you are the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses.

I also remind you again that both the People and the defendant are entitled to the individual opinion of each juror. It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict if you can do so. Each of you must decide the case for yourself but should do so only after a discussion of the evidence and instructions with the other jurors.

You should not hesitate to change an opinion if you are convinced it is erroneous; however, you should not be influenced to decide any question in a particular way because the majority of the jurors or any of them favor such a decision.

And when you are discussing and deliberating, remember, too, you are not partisans or advocates in this matter, but you are judges.

The jury deliberations at that point were apparently sufficiently unpleasant that, as the jury left for lunch after receiving the last instruction, one of the other jurors, Juror 9, handed the bailiff a note saying she was frustrated with the deliberations and wished to be excused for the rest of the day. The court had the bailiff tell the juror she should come back to deliberate after lunch. The court informed counsel of the inci-

dent while the jury was deliberating. Defense counsel made no objection to the court's communication with Juror 9.

Soon after lunch, the jury returned a guilty verdict against Smith on Count 4, the oral copulation count. Smith filed an unsuccessful motion for a new trial, on the basis of both the judge's comments on the evidence to the jury, to which there had been a strenuous objection, and the handling of Juror 9's letter, to which there had been no objection.

In his direct appeal, Smith challenged the comments on the evidence, urging that in the context of the judge's knowledge of Juror 10's doubt about the DNA evidence, the judge's comments highlighting other evidence supporting conviction were coercive and violated federal law. The California Court of Appeal rejected the claim on the merits, describing the comments as "scrupulously fair" and neither encouraging a verdict for or against the defendant. The court cited the state's constitutional provision authorizing a judge to comment on the evidence, *see* Cal. Const. art. VI, § 10, and cases applying it.

The direct appeal also involved a claim that the court should have advised counsel immediately about Juror 9's wish to be excused. The state appellate court ruled Smith had waived the claim by failing to object.

Smith filed this habeas petition in federal district court pro se. After appointing counsel, the district court granted the petition on the claim that the judge's comments regarding the defendants' statements were coercive and violated clearly established federal law, but denied the petition on Smith's claims of constitutional error arising from the court's ex parte contact with Juror 9. The state appealed and Smith cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 2253(a).

### *ANALYSIS*

In reviewing the district court's grant or denial of a habeas petition under 28 U.S.C. § 2254, we conduct our analysis de novo. *See, e.g.*, *Yee v. Duncan*, 463 F.3d 893, 897 (9th Cir. 2006). The function of the federal courts under the standards of the Antiterrorism and Effective Death Penalty Act ("AEDPA") is to review the "last reasoned decision" of the state courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). A federal habeas petitioner is entitled to habeas relief in limited circumstances. Even if his conviction involved a violation of the United States Constitution, habeas relief is warranted only if the decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2).

The Supreme Court has held that "clearly established Federal law" under AEDPA means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). In this case, the last reasoned state court decision is the 2000 decision of the California Court of Appeal.

## I. The Instruction to a Deadlocked Jury

The trial judge in this case instructed the jury, after it had returned deadlocked for the third time, that it should consider certain "consistencies and inconsistencies" in the evidence apart from the DNA evidence that the holdout juror, Juror 10, had questioned. The evidence that the district court selected and replayed for the jury consisted of the post arrest statements of the codefendants, Hinex and petitioner Smith. The statements were all consistent in stating that Smith went into

the house where the crimes were committed, but were inconsistent as to whether Hinex went in and whether Hinex was ever alone with Mrs. S. The trial judge delivered his comments over defense counsel's vehement objection that they were calculated to produce a guilty verdict in light of Juror 10's concerns about DNA evidence, because the judge had heard so much scientific evidence the jury did not hear that validated the DNA results in the case. Defense counsel also insisted that the judge's comments on the evidence would not be "scrupulously fair" because they isolated Smith's and Hinex's contradictory in-court testimony.

[1] California's constitution expressly provides that a judge may comment on the evidence. "The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." Cal. Const. art. VI, § 10. In approving the judge's instruction and commentary, the state Court of Appeal cited two California cases in which the judge had commented on the evidence to a deadlocked jury. *People v. Proctor*, 842 P.2d 1100 (Cal. 1992); *People v. Rodriguez*, 726 P.2d 113 (Cal. 1986). Neither involved a trial court addressing known concerns of a holdout juror.

In upholding the commentary and instruction in this case, the California Court of Appeal correctly recognized that California law is more lenient than federal guidelines imposed by the United States Supreme Court in the exercise of the Court's supervisory powers over the federal district courts instructing a deadlocked jury. The state court also acknowledged that California courts must respect federal constitutional protections as delineated by the U.S. Supreme Court. The issue in federal habeas review is whether the Court of Appeal's opinion is contrary to clearly established federal law or an unreasonable application of established federal law.

[2] The Supreme Court has not often had occasion to deal with the constitutional dividing line between instructing a jury

and coercing it. This is no doubt because the Court in the exercise of its supervisory powers has developed prophylactic rules to govern the federal courts. *See, e.g.*, *Quercia v. United States*, 289 U.S. 466 (1933). We therefore deal with only a handful of cases directly applying constitutional limits on the authority of a trial judge to encourage a jury toward productive deliberations resulting in an unanimous verdict. Those cases, however, define with clarity some of the critical federal constitutional boundaries. An analysis of the Supreme Court's decisions, dating back to 1896, requires us to conclude that the California Court of Appeal's approval of the instruction in this case, directing the jurors to the evidence the judge believed supported conviction, crossed the boundary from appropriate encouragement to exercise the duty to deliberate in order to reach a unanimous verdict, and went into the forbidden territory of coercing a particular verdict on the basis of the judge's selective view of the evidence. The state court's decision upholding the instruction as a fair instruction was an unreasonable application of established Supreme Court law.

The grandparent of all the cases dealing with instructing a deadlocked jury is *Allen*, 164 U.S. 492, the first case to consider and approve the use of a supplemental charge to a deadlocked jury. The *Allen* instruction charged the jurors in the minority to consider the views of the majority and to ask themselves whether their own views were reasonable. 164 U.S. at 501. In approving this instruction, the Court said that jurors should listen and be willing to change their minds:

> While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he

> finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself.

*Id.* at 501-02.

The charge approved in *Allen* is similar to the first two supplemental charges that the trial judge gave the jurors in this case. Those instructions are not challenged. The third supplemental charge, however, went far beyond *Allen*. The trial court by that time knew what was dividing the jury and therefore commented on specific evidence to address the known concerns of a holdout juror.

For further guidance we jump forward nearly a hundred years to the Supreme Court's decision in *Lowenfield*, 484 U.S. 231. *Lowenfield* was a habeas case arising out of a Louisiana state court conviction. After receiving notes from the jury that it was having difficulty reaching a decision, the judge polled the jury as to whether further deliberations would be helpful. The judge asked each juror, "Do you feel that any further deliberations will enable you to arrive at a verdict?" *Id.* at 234. Eleven jurors answered in the affirmative and one in the negative. *Id.* at 234-35. The court then reinstructed the jury, telling it that if it was unable to agree unanimously on a recommendation "the Court shall impose the sentence of Life Imprisonment without benefit of Probation, Parole or Suspension of Sentence." *Id.* at 235. Defense counsel did not object to the polling or the supplemental instruction, and the jury returned in thirty minutes with a verdict sentencing the defendant to death. *Id.*

In upholding the conviction and rejecting the habeas petitioner's claim of improper coercion, the Court reiterated the

same standard that it had previously used in cases involving its exercise of supervisory powers of lower federal courts, which is that reviewing courts must consider the trial court's supplemental charge "in its context and under all the circumstances." *Id.* at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). The Court concluded in *Lowenfield* that the instruction was not coercive in the circumstances of that case. It rested this conclusion in major part upon its determination that the instruction in that case was less coercive than in *Allen*, because the court in *Allen* urged the minority to consider the views of the majority and to question the reasonableness of the minority's own views. *Id.* at 237-38. Quoting the famous language from *Allen* that the object of the jury system is to "secure unanimity by a comparison of views," the Supreme Court in *Lowenfield* said that the "continuing validity of this Court's observations in *Allen* are beyond dispute, and they apply with even greater force in cases such as this, where the charge given, in contrast to the so-called 'traditional *Allen* charge,' does not speak specifically to the minority jurors." *Id.* In the case before us, of course, the court's third supplemental instruction spoke directly to the minority juror.

With respect to the polling of the jury that informed the trial court in *Lowenfield* of the jury's numerical division on the utility of future deliberation, the Supreme Court stressed that the trial court did not know how the jurors stood on the merits. In polling the jury, the trial judge in *Lowenfield* was not asking the jurors "how they stood on the merits of the verdict, but how they stood on the question of whether further deliberations might assist them in returning a verdict." *Id.* at 240. In this case, the court did know exactly how the jurors stood on the merits.

[3] *Lowenfield* went so far as to observe that it is impermissible for the judge to instruct the jury it must reach a verdict. 484 U.S. at 239. In this case, the trial court can be said to have gone beyond simply instructing the jury that it must

reach a verdict; the judge pointed the jury to evidence leading to a particular verdict.

**[4]** The California Court of Appeal did not discuss any of these federal constitutional standards. The most recent Supreme Court decision with respect to deadlocked jury instructions and habeas relief reminds us, however, that the state court need not expressly cite federal law in its decision. *See Early*, 537 U.S. at 8 (for the state court, avoiding a decision that is "contrary to" clearly established federal law "does not require citation of [Supreme Court] cases — indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state court decision contradicts them.") (original emphasis). It is not enough that the state courts "failed to apply" clearly established Supreme Court law; the state court decision must be contrary to Supreme Court law or an unreasonable application of it. *Id.* Accordingly, whether a supplemental instruction amounts to coercion of a constitutional degree must be judged on the basis of all the circumstances in the case. *Lowenfield*, 484 U.S. at 237 (citing *Jenkins*, 380 U.S. at 446).

**[5]** The trial court in this case effectively highlighted the specific evidence the court thought supported the guilty verdict favored by the majority of jurors. Moreover, the court did so over the vehement and eloquent objection of defense counsel, who pointed out in no uncertain terms that the instruction was likely to coerce the holdout juror to agree to convict.

**[6]** The California Court of Appeal's conclusion that the trial court's instruction was not coercive—in particular its determination that "the [trial] court's comments on the evidence were scrupulously fair" and so they did not deprive Smith of his constitutional right to trial by jury — was an objectively unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d). The judge knew not only the division of the jury but also the precise reasons the holdout juror, in his note, said he "in good conscience

[could] not vote for conviction." In light of this knowledge, the judge directed — not suggested — that the jury, and the holdout juror in particular, concentrate on certain evidence. The judge did so after presenting a summary of that evidence that was one-sided both as to the description of the evidence itself and its relation to the other evidence in the trial as a whole. By taking over the jury deliberations in this manner, the trial judge deprived Smith of his constitutional right to trial by jury. The California Court of Appeal's contrary conclusion was objectively unreasonable, for several reasons.

**[7]** First, the trial judge's comments on the evidence were addressed to the holdout juror, and the juror had to have known that. The judge had told the jury that because of its inability to reach a verdict, and in light of the communications the judge had thus far received, he was issuing a further instruction, which, as it turned out, included the summary of the evidence and the direction to listen to the replaying of the taped interrogations. The jury, or the holdout juror at the very least, knew that Juror 10's note was one of the communications the judge was referring to, and would expect the judge's further instructions to address the concerns stated in that note. In particular, given the specific inquiry in Juror 10's note about whether there was any other credible evidence on the oral copulation charge, and the nature of the judge's new instructions and comments, the holdout juror reasonably could have understood that the trial court was specifically urging that juror to reconsider his inability to vote for conviction, by pointing to evidence other than the DNA evidence that, in the judge's view, supported a guilty verdict.

**[8]** Second, the judge's charge, using mandatory language, directed the jury to weigh Smith's and Hinex's post-arrest statements to the police. The charge did not merely suggest that the jury "consider and discuss" the statements; the judge told it to do so. In addition, the judge required the jury to listen again to the taped interrogations. The judge highlighted the importance of Smith's and Hinex's interrogation evidence

even further by sending transcripts of the statements — and only those statements — into the jury room, although the jury had not asked for them.

**[9]** Third, the summary of the evidence was not neutral by any reasonable standard, whether viewed in isolation or in light of all the evidence at trial. In describing the consistencies and inconsistencies between Hinex's and Smith's statements, the judge twice referred to Hinex's insistence that he did not go in the house. Yet, Hinex's contention that he stayed outside the house's screen door at all times was strongly contradicted by all the other witnesses' trial testimony. For example, both Mr. and Mrs. S testified that two men had been in the house. Right after the crime, both identified Hinex as one of them—indeed, as the one who carried the gun and sexually assaulted Mrs. S. And both Hinex and Smith insisted in their police statements that they were the only two individuals at the scene.

Yet, in the Hinex interview the judge summarized for the jury, required the jury to hear, and made available to the jury in the jury room in transcript form, Hinex maintained that only one person, Smith, went into the main part of the house. The judge's comments thus isolated Hinex's statement from the other trial evidence that placed Hinex in the Ss' home and possibly responsible for the oral copulation crime, directing the jury to compare the Hinex statement to the post-arrest interview of Smith. Viewed in the context of the rest of the trial evidence, the judge's comments inappropriately directed the jury to give equal weight to Hinex's and Smith's post-arrest statements with respect to whether a second person was in the home. The judge omitted to point out that much of Hinex's account did not square with the other trial evidence, while Smith's basic story — leaving aside his denial on the oral copulation issue — did.

**[10]** Fourth, the judge's summary of the taped interrogations omitted a key inconsistency between Smith's and

Hinex's post-arrest statements to the police. As the judge summarized the statements, both Smith's and Hinex's statements were consistent in that both represented that Smith was alone with Mrs. S in the bedroom for a while. But Smith's actual statement was that Smith at some point left Hinex with Mrs. S in the bedroom while Smith searched other rooms in the house. Thus, from the judge's summary of what were, in his view, the "most important" consistencies and inconsistencies in the statements, both Smith and Hinex agreed that only Smith had been alone in the bedroom with Mrs. S. The judge omitted Smith's contrary exculpatory statement to Detective Willover, that Hinex had also been alone with Mrs. S and so had the opportunity to perpetrate the sexual assault. The omission was highly detrimental to Smith.

Overall, in contrast to the California Court of Appeal's conclusion that the trial court "highlight[ed] the defendants' statements to the police" in a way that "did not 'specifically reference' any particular inconsistency to the defendant's detriment," the trial judge twice repeated, and so emphasized, Hinex's statement that only Smith went into the house, while ignoring a critical portion of Smith's testimony that contradicted Hinex's account. The trial court thus did select particular inconsistencies to the defendant's detriment.

**[11]** The probable coercive effect is illustrated by the fact that the jury deliberated for only slightly longer than one hour after receiving the last instruction. *See Lowenfield*, 484 U.S. at 240 ("[W]e are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."). Defense counsel timely objected on coercion grounds, demonstrating that the potential harm to the defendant, as well as the judge's preconceived view of Smith's guilt, was immediately apparent. *Cf. id.* (defense counsel's failure to object to a supplemental instruction "indicates that the potential for coercion argued now was not apparent to one on the spot").

**[12]** In sum, the California Court of Appeal's conclusion that the trial court's comments on the evidence were "scrupulously fair" was objectively unreasonable, and its legal conclusion regarding jury coercion, based on that assessment, was consequently objectively unreasonable as well. In fact, the comments substituted the judge for the jury as to the manner and substance of deliberations and thereby denied Smith his constitutional right to the uncoerced verdict of the jury.

We emphasize that it was the combination of factors, including the fact that the comments were directed to the known concern of the holdout juror, and the incomplete, one-sided summary of the evidence related to those concerns, that makes the Court of Appeal's conclusion an unreasonable application of Supreme Court law regarding jury coercion. Absent these factors, we might reach a different conclusion. With them, the case represents the most coercive instruction of any in the coercion cases we have reviewed.

The California Court of Appeal was not only incorrect in determining that the trial court's actions and comments were proper, but was objectively unreasonable in so concluding.

## II.   The Trial Court's Ex Parte Contact with Juror 9

In his cross-appeal, Smith challenges the district court's denial of habeas relief on his claim that the state trial court's ex parte contact with a member of the jury, Juror 9, violated his right to counsel, his right to be present, and his right to a fair trial. We affirm the district court's denial of relief on these claims.

The trial court's contact with Juror 9 occurred immediately after the court gave the final instruction in which it improperly commented on the evidence the court believed supported Smith's guilt on the oral copulation charge. As the jury left the courtroom for lunch following this instruction, Juror 9 handed the bailiff a note expressing her frustration with the

course of the deliberations, and stating that she wished to be excused for the day due to another commitment. The court had the bailiff instruct Juror 9 to return for deliberations after lunch, but did not inform either the prosecutor or defense counsel of this incident until they were in the courtroom waiting for the jury to return with a verdict on the oral copulation charge. Defense counsel made no objection at the time.

On direct appeal, the Court of Appeal found Smith had waived any constitutional claims by failing to object in a timely manner. The court stated:

> A trial court may discharge a juror for good cause and substitute an alternate juror at any time before the jury has returned its verdict to the court. . . . [E]ven though the jury had reached a verdict by the time the trial court told counsel about the note from juror No. 9, defense counsel could still have demanded a hearing on whether that juror was fit to deliberate, and the court could still have discharged the juror on a showing of good cause and substituted an alternate.

**[13]** The Court of Appeal's determination was not contrary to or an unreasonable application of established federal law. The Supreme Court has expressly held that counsel's failure to object at trial upon learning of the judge's ex parte contact with a juror constitutes a waiver of any constitutional claims stemming from the contact. *United States v. Gagnon*, 470 U.S. 522, 528 (1985). Moreover, even if there were any constitutional error, Smith has not shown that the trial court's ex parte contact with Juror 9 was prejudicial. *See Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam) (any constitutional error resulting from ex parte contact between a juror and the court is subject to harmless error analysis); *United States v. Madrid*, 842 F.2d 1090, 1093-94 (9th Cir. 1988) (defendant must demonstrate "actual prejudice" resulting from ex parte contact between the trial judge and a juror).

**[14]** The contact between Juror 9 and the court pertained solely to the juror's wish to be excused from deliberations, not to any factual or legal issue in Smith's case. Although Juror 9's communication reveals the extent of the jury's frustration with the deliberations, strengthening Smith's claim that the trial court's instructions and comments on the evidence were coercive, the trial court's ex parte contact with Juror 9 itself has not been shown to have affected the outcome. We agree with the district court that the state court's ex parte contact with Juror 9 "did not impair [Smith's] right to a fair trial" because there was no "reasonable possibility of prejudice from the exchange."

## *CONCLUSION*

The trial court's third instruction and comment to the jury was coercive and the Court of Appeal's opinion upholding Smith's convictions was an unreasonable application of United States Supreme Court law that was firmly established at the time. Accordingly, we affirm the district court's grant of habeas corpus relief on this claim. We also affirm the district court's denial of habeas corpus relief on the claims stemming from the trial court's ex parte contact with a juror.

The judgment of the district court is AFFIRMED.

---

N.R. SMITH, Circuit Judge, concurring in part and dissenting in part:

I concur in Part II of the majority opinion. I respectfully dissent with regard to Part I, because I believe the majority misapplies the exceptionally deferential standard of review required by the Antiterrorism and Effective Death Penalty Act ("AEDPA").

With the AEDPA standard of review, Congress set the bar exceptionally high to ensure that federal courts afford the

utmost deference to a state court adjudication. *See Riley v. Payne*, 352 F.3d 1313, 1323 (9th Cir. 2003) ("This standard is properly deferential because of the important role that state courts play in applying federal constitutional guarantees and because of federalism concerns that are evoked when we assess whether a state court system holds a state prisoner in violation of the federal constitution."). Therefore, a federal court may not grant habeas relief from a state court conviction unless it concludes that the state court's adjudication of the claims "(1) resulted in a decision that was contrary to, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (emphasis added); *Price v. Vincent*, 538 U.S. 634, 638-39 (2003).

It is clearly established that a "criminal defendant . . . being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Smith*, 484 U.S. 231, 241 (1988). I do not disagree with the majority's general assessment that, given the trial judge's knowledge of the holdout juror's concerns, the trial court's supplemental instructions and the manner in which the judge selectively commented on the evidence likely affected the jury's verdict. Therefore, in my view, the California Court of Appeal was simply wrong in concluding that the trial judge's comments on the evidence were "scrupulously fair" and not coercive.

Yet, to grant relief under the AEDPA, it is simply not enough for us to conclude that the state court decision is wrong. *See Early v. Packer*, 537 U.S. 3, 11 (2002) (per curiam); 28 U.S.C. § 2254(d)(1) & (2). Even if we are "left with a firm conviction that the state court was erroneous," we cannot grant relief unless the state court's application of clearly established Supreme Court holdings[1] was objectively

---

[1]"[T]he only definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as

unreasonable. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citations omitted); *Ramirez v. Castro*, 365 F.3d 755, 762 (9th Cir. 2004) ("The petitioner must demonstrate not only that the state court's application of governing federal law was erroneous, but also that it was objectively unreasonable.") (citing *Andrade*, 538 U.S. at 75). "A state court's decision is an unreasonable application of clearly established federal law if 'the state court identifies the correct governing legal principles from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case.' " *Ramirez*, 365 F.3d at 762 (citing *Williams*, 529 U.S. at 413) (alterations in *Ramirez*). *See also Andrade*, 538 U.S. at 75.

In this very difficult case, I believe the majority has "fail[ed] to give proper deference to [the] state court[ ] by conflating error (even clear error) with unreasonableness." *Andrade*, 538 U.S. at 75 (citations omitted). *See also Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (reversing us because we failed to observe the distinction between an incorrect application and an unreasonable application); *Packer*, 537 U.S. at 11 (same). "Even if we agreed . . . that there was jury coercion here," we should not grant of relief if "it is at least reasonable to conclude that there was not . . . ." *Packer*, 537 U.S. at 11. In other words, to affirm the district court's grant of relief, we must conclude that, in context and considering all of the circumstances of this particular case, no rational court applying *Lowenfield* could conclude that the verdict was anything but coerced.

In this case, the California Court of Appeal reviewed the trial judge's supplemental instruction and considered his comments on the evidence (even if the court did not expressly restate every fact or circumstance in its decision). In conclud-

---

of the time of the state court decision." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

ing that the verdict was not coerced, the Court of Appeal reasoned that the trial judge did not tell the jury what verdict to reach or expressly indicate what conclusion ought to be reached from the evidence upon which the judge commented. The trial judge did not indicate which of the witnesses (the petitioner or his co-defendant) was more credible. He did not express any notion of the petitioner's guilt or innocence. He also did not tell the jury that it had an obligation to reach a verdict. Further, the trial judge did not affirmatively poll the jury or ask the jury about its numerical division. That the trial judge ultimately learned of the jury's division and of the specific concerns of the holdout juror is problematic. That he then selectively summarized the evidence is equally troublesome. But I can find no clearly established federal law indicating that a trial judge may not comment on the evidence when he knows the numerical division of the jury, and no Supreme Court holding requires a state court judge (when commenting on the evidence) to recite any and all evidence that might be relevant, contradictory, or even exculpatory.

I agree with the majority that the evidence the trial judge selectively presented and summarized (given the holdout juror's concerns), may have had a coercive effect on the jury. I dissent because it may at least be reasonable to conclude that it did not. *See Packer*, 537 U.S. at 11. On this basis, I would reverse the district court's grant of relief on the basis that the California Court of Appeal's decision was not an objectively unreasonable application of clearly established Supreme Court precedent.