IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 13, 2022

**STATE OF TENNESSEE v. ROOSEVELT PITTS, III**

**Appeal from the Circuit Court for Rutherford County**
**No. 73282     James A. Turner, Judge**

_____

**No. M2022-00581-CCA-R3-CD**

_____

In this delayed appeal, the Defendant-Appellant, Roosevelt Pitts, III, challenges his Rutherford County jury convictions of robbery, three counts of felony reckless endangerment, misdemeanor leaving the scene of an accident, and felony vandalism, for which he received an effective sentence of eighteen years in prison. The Defendant argues that the trial court erred in rejecting his challenge to two peremptory challenges based on Batson v. Kentucky, 476 U.S. 79 (1986), and that the State engaged in prosecutorial misconduct during closing arguments. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Steven Chase Fann, Murfreesboro, Tennessee, for the Defendant-Appellant, Roosevelt Pitts, III.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sara N. Davis, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant does not challenge the proof supporting his convictions in this case. We will therefore provide only a summary of the evidence as presented at trial. On the morning of December 12, 2014, Carlos Velasquez and his ten-year-old daughter, Milagro, were outside in the driveway of their Rutherford County home warming their truck and waiting for the school bus. Velasquez saw a person, later identified as the Defendant, crouched down behind his truck, pass by him, then get inside his truck. The Defendant

pushed Velasquez and his daughter with the door of the truck, struck Velasquez multiple times, and yelled, "move, move, b----." The Defendant put Velasquez's truck in reverse and began to drive away. A struggle ensued, and Velasquez fell into a mailbox and onto the ground. At the time of the offense, Velasquez and his daughter were afraid and did not give the Defendant permission to take the truck. Velasquez's son called the police, and the Defendant was reported to have been seen driving the stolen truck toward I-24. Another witness observed the "commotion" in the driveway, saw the Defendant drive the truck erratically down an adjoining highway, and then crash into a tree near an apartment complex. The witness observed the driver get out, reach inside the truck, grab a backpack, and take off running. The police responded to the location where the witness observed the crash, walked behind the apartment complex, observed a black male matching the description given by the victims, and took the Defendant into custody. Upon being advised of his rights under Miranda, the Defendant told the officers that "he needed a ride to Nashville, so he took the truck." The Defendant also later requested his cell phone to be retrieved from Velasquez's truck, and a cell phone not belonging to Velasquez was recovered from the passenger side floorboard of his truck. Velasquez's truck, a 2010 Ford F-150, was valued at $26,000, and he paid $4,000 out-of-pocket to repair the damage caused by the Defendant.

The jury convicted the Defendant as charged in count one of the indictment of robbery; in count three of a lesser included offense of reckless endangerment committed with a weapon to wit: an automobile; in count four of reckless endangerment committed with a deadly weapon to wit: an automobile; in count five of reckless endangerment committed with a weapon to wit: an automobile; in count six of leaving the scene of an accident resulting in damage to property with an amount of damages that exceeds $400; and, in count seven of vandalism with a value of more than $1,000 but less than $10,000. The jury found the Defendant not guilty of carjacking as charged in count two. The Defendant was sentenced to ten years in prison for robbery, four years in prison for each reckless endangerment conviction, eleven months and twenty-nine days in prison for leaving the scene of an accident, and eight years in prison for vandalism. The trial court ran the reckless endangerment, leaving the scene of an accident, and vandalism sentences concurrently with each other and consecutively to the robbery sentence, for an effective sentence of eighteen years. The trial court ordered each of these sentences to be served consecutively to any prior convictions that the Defendant was ordered to serve based on his violation of probation in those cases. The Defendant filed a motion for a new trial and an addendum to it, both of which were denied by order on July 13, 2016.

In his first direct appeal, the Defendant argued that the State discriminated against prospective jurors by excusing them for race-based reasons and that the State engaged in prosecutorial misconduct during closing arguments. State v. Roosevelt Pitts, III, No. M2016-01879-CCA-R3-CD, 2017 WL 1192114, *1 (Tenn. Crim. App. Mar. 30, 2017). In

affirming the convictions, this Court concluded that the Defendant had waived these issues based on an insufficient record because the Defendant failed to provide a transcript of the jury selection process or the closing arguments on appeal. The Defendant filed for post-conviction relief, arguing in part that appellate counsel was ineffective in failing to provide a sufficient record in support of the issues on direct appeal. By order issued on March 25, 2022, the post-conviction court agreed and determined that while appellate counsel had obtained the trial transcript and made appropriate references and citations to it in the appellate brief, the Rutherford County Circuit Court Clerk had failed to submit the transcript to the appellate court clerk. The post-conviction court granted the Defendant relief in the form of a delayed appeal for the purpose of remedying the error in the prior direct appeal. On May 3, 2022, the Defendant issued his notice of delayed appeal, and on June 6, 2022, the Defendant filed a motion to waive the thirty-day timeline for the filing of the notice of appeal. By order issued on June 13, 2022, this Court set out the unusual posture of this case and waived the untimely filing of the notice of appeal. See Order, Roosevelt Pitts, III v. State, No. M2022-00581-CCA-R3-PC (Tenn. Crim. App. June 13, 2022) (granting appellant's request to waive thirty-day filing deadline). This matter is now properly before this court for review.

## ANALYSIS

**I. Alleged Batson Violations.** The Defendant contends that the trial court erred in allowing the State to strike two (2) African American jurors from the jury venire with an insufficient race-neutral explanation for each challenge. The Defendant argues that both jurors' responses ultimately showed they could be fair in analyzing Defendant's case, and that the State's dismissal of each juror warrants a new trial. In response, the State contends the trial court properly denied the Defendant's Batson challenges because he failed to make a prima facie case of purposeful discrimination, and the State provided race-neutral explanations that were not pretextual.

We apply the following well-established legal framework to the issue presented herein. The Equal Protection Clause of the United States Constitution prevents the State from exercising peremptory challenges to excuse potential jurors on account of their race. Batson, 476 U.S. at 89; State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006). In Batson, 476 U.S. at 89, the United States Supreme Court held that the State's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates that defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. A few years later, in Powers v. Ohio, 499 U.S. 400, 416 (1991), the Court held that a criminal defendant may object to race-based exclusions of jurors through peremptory challenges regardless of whether the defendant and the excluded jurors share the same race.

- 3 -

When a defendant alleges that the State is excluding a juror based on the juror's race, Batson provides a three-step process for determining when a peremptory challenge is discriminatory. 476 U.S. at 96-98; see State v. Kiser, 284 S.W.3d 227, 255 (Tenn. 2009); Foster v. Chatman, 578 U.S. 488, 136 S. Ct. 1737, 1747 (2016). The first prong requires the defendant to make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Batson, 476 U.S. at 93-94; Kiser, 284 S.W.3d at 255. A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 93-94. Under this first step, the defendant need not establish that the State's challenge was "more likely than not the product of purposeful discrimination." Johnson v. California, 545 U.S. 162, 170 (2005); State v. Stephen Maurice Mobley, No. E2020-00234-CCA-R3-CD, 2021 WL 3610905, at *16 (Tenn. Crim. App. Aug. 16, 2021), appeal denied (Jan. 13, 2022). Additionally, "the exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992).

If the trial court determines that the defendant has made out a prima facie showing that the peremptory challenge has been exercised on the basis of race, then the second step requires the State to provide a race-neutral explanation for its challenge. Batson, at 97; State v. Echols, 382 S.W.3d 266, 281 (Tenn. 2012) (citing Kiser, 284 S.W.3d at 255-56). The State's race-neutral explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge ... [but] need not be persuasive, or even plausible." Hugueley, 185 S.W.3d at 368 (citing Purkett v. Elem, 514 U.S. 765, 767-68 (1995)). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.'" Id. (quoting Purkett, 514 U.S. at 768).

If the State offers a race-neutral explanation, then the third prong requires the trial court to determine if the defendant has established purposeful discrimination. Batson, 476 U.S. at 98; see Hugueley, 185 S.W.3d at 368 ("If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination."). When considering this third step, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365 (1991). "[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994); see Miller-El v. Cockrell, 537 U.S. 322, 339 (2003) ("Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."). "'The trial court may not simply accept a proffered race-neutral reason at face value but must

examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.'" Kiser, 284 S.W.3d at 255 (quoting Hugueley, 185 S.W.3d at 368). At this third step, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768. If the court finds that the proffered reason is merely pretextual and that the challenge is racially motivated, then the juror may not be excluded. Kiser, 284 S.W.3d at 255 (citing Hugueley, 185 S.W.3d at 369).

"[T]he ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge." Hugueley, 185 S.W.3d at 374 (citing Batson, 476 U.S. at 93); see also Purkett, 514 U.S. at 768 (recognizing that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). The Tennessee Supreme Court has emphasized the importance of a trial court's findings regarding a Batson violation:

> The trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination. The trial court's factual findings are imperative in this context.

Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996); see Batson, 476 U.S. at 97.

"On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous." Woodson, 916 S.W.2d at 906; see Foster, 136 S. Ct. at 1747 (noting that the third step in Batson "turns on factual determinations," and that "'in the absence of exceptional circumstances,' we defer to state court factual findings unless we conclude that they are clearly erroneous." (citation omitted)). "Deference [to the trial court's findings on the issue of discriminatory intent] is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well positioned as the trial court is to make credibility determinations." Miller-El, 537 U.S. at 339.

During the first interaction with Juror One, the State had inquired generally to the entire venire whether anyone individually had been a victim of a crime or whether they had a family member who had been a victim of a crime.[1] Juror One explained that her son had been robbed at gunpoint and the perpetrators were never caught. The transcript from jury selection reveals, in pertinent part, as follows:

---

[1] We refrain from identifying jurors by name to protect their privacy.

[STATE]: So, in this particular case, the Defendant is charged with robbery and carjacking. So, it's kind of a similar situation. It's not exactly the same because there is no deadly weapon, there's no gun involved. But it is a similar crime. . . Do you think that the fact that your son was a victim of that and this Defendant is charged with a similar crime that you could be fair in this case?

[JUROR ONE]: I think it will be a problem. Because I had – when you first said did anybody have a crime [sic], I had a total blank. And I just remembered that that happened to him.

[STATE]: Okay.

[JUROR ONE]: Because it was very traumatic for me, for my son, for my family. So, you know, because I do – I did have a problem that day thinking that my son could have been dead.

[STATE]: Right.

[JUROR ONE]: And I blacked it out until just now. Your son got robbed at gunpoint. That – yeah, it would be.

[STATE]: Okay. Well, let me say this, because we have to make sure. What we need to know from everyone in the jury pool is, as a juror you have to listen to the evidence as it comes from the witness stand. And you have to make your decision about the Defendant's guilt based on the evidence. The testimony, whatever exhibits we put in at trial. You can't use your own personal life experience to base that decision on. You can't be biased. That's what we're trying to determine here. Do you think you can listen to the evidence and make your decision based on the evidence, and not let your personal feelings get in the way?

[JUROR ONE]: I want to be fair. I would say no.

[STATE]: Okay. So, you do not think you could be fair.

[JUROR ONE]: I don't know. So, I would rather not. Because right now I'm having all kind --- like kind of anxiety type feelings going on right now. So, I don't feel ---

- 6 -

[STATE]: Well, that could be from public speaking.  Some people just don't like to talk in public.

[JUROR ONE]: Well, I'm a minister.  So, I do a lot of public speaking.

[STATE]:  Okay. So, that's not it.  That's not it.  Okay.  Alright.

[JUROR ONE]:  It should make it better for me to be able to be.  But I want to be truthful, as well as what I'm feeling inside here is not – not nothing bad.  But it's like kind of ---

[STATE]: Well, it's important to be honest.

[JUROR ONE]: It brought up some stuff that I had laid aside.  And I'm not sure if that is good or bad.  I don't know.

Juror Two responded affirmatively to the same question and explained that when she and her husband lived in Atlanta, their car was stolen.  She said the police ultimately recovered their car, and she described the crime as "kids . . . joyriding."  After the exchange with Juror Two, a second exchange with Juror One occurred during which she said her brother had been arrested and incarcerated many times for robbery.  She said he "just did 15 years for armed robbery."  She did not believe her brother was wrongfully accused nor did she believe this would impact her ability to be fair in the instant case.  A second exchange then occurred with Juror Two during which she acknowledged that her brother also had been arrested for selling drugs.  She agreed he had in fact committed the crime and that he was treated fairly by the police and the office of the district attorney.  Juror Two added that other family members whom she had never met had also been incarcerated.  Juror Two continued to share that "something happened to her in college" and she was arrested with a group of people for having a sawed-off shotgun in the car, even though she was unaware of the gun.  She gave a detailed account of the encounter, advised that she entered a guilty plea to probation, and denied the experience would impact her ability to be fair in the instant case.

At the close of the question-and-answer phase of jury selection, the trial court began the process of exercising peremptory challenges by the parties.  See State v. Spratt, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000) (noting that a peremptory challenge allows for the removal of jurors who may exhibit hostility or bias but whose removal for cause has not been established).  During what appears to be the third round of peremptory challenges, defense counsel asked for a sidebar and lodged a Batson challenge in response to the State exercising a peremptory challenge to Juror Two.  The State insisted that a Batson challenge was not appropriate until after there had been an established pattern of striking people of a

cognizable racial group but nevertheless explained the basis for striking Juror Two was because she said "she had been charged for a crime which she did not commit. She also was unclear about whether she could be fair." In denying the Defendant's <u>Batson</u> challenge, the trial court agreed that a pattern was required for a challenge to be upheld and that the State had given a non-discriminatory reason for its challenge.

The State then explained that it was unclear of the trial court's preference for when to exercise challenges for cause and requested at that time to challenge Juror One for cause. As grounds, the State asserted that Juror One "pretty much" said she could not be fair. The State said that it asked her in "every possible way," and Juror One said she could not be fair. The State advised the trial court if sufficient grounds did not support a for cause challenge, it intended upon using a preemptory challenge to strike Juror One. The trial court then engaged Juror One in an extensive discussion regarding her ability to be fair and Juror One remained on the jury until the next round of preemptory challenges. The State exercised another peremptory challenge and struck Juror One from the venire. Defense counsel lodged his second <u>Batson</u> challenge. In response, the State said the basis for striking Juror One was because she had stated that she had "family members, including her brother who had been charged with robberies" for which they had gone to jail. The State insisted, and the trial court agreed, that this was a "non-discriminatory basis for the challenge[.]" The transcript from the motion for new trial hearing and the order so denying reflect that the trial court denied the Defendant's <u>Batson</u> claims based on the same grounds as stated during trial.

As for the first step in the <u>Batson</u> analysis, we note that the trial court did not explicitly determine whether the Defendant had made a prima facie case of purposeful discrimination. We can assume however based on this record that the court implicitly found that the Defendant had satisfied the first prong of the <u>Batson</u> test. <u>See</u> <u>Hernandez</u>, 500 U.S. at 359, 111 S.Ct. at 1866 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges [without prompting] and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."); <u>State v.</u> <u>Hugueley</u>, 185 S.W.3d at 371 (citing <u>Woodson,</u> 916 S.W.2d at 905). Moreover, although the trial court's findings are relatively sparse relating to the State's race-neutral explanation for the challenge, we conclude the record is sufficient for our review. <u>State v. Carroll</u>, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000). Finally, we are compelled to point out that the State and the trial court erred in asserting that a pattern of strikes was required to establish a prima facie case of discrimination under <u>Batson</u>. Although the United States Supreme Court noted in <u>Batson</u> that a "pattern" of strikes against black jurors can give rise to an inference of discrimination, the Court also stated that proof of a pattern is only one way to establish a prima facie case. <u>State v. Ellison</u>, 841 S.W.2d 824, 827 (Tenn. 1992); <u>Batson</u>, 476 U.S. at 97, 106 S. Ct. at 1723; <u>see</u> <u>also</u> <u>Stephen Maurice Mobley</u>, No.

E2020-00234-CCA-R3-CD, 2021 WL 3610905, at *16; Timothy Tyrone Sanders v. State, No. M2003-02416-CCA-R3-PC, 2005 WL 354100, at *4 (Tenn. Crim. App. Feb. 15, 2005); Benjamin Blackwell v. State, No. W2001-02179-CCA-R3-PC, 2003 WL 402805, at *6 (Tenn. Crim. App. Feb. 12, 2003); State v. Theddaeus Medford, No. W2001-02930-CCA-R3-CD, 2003 WL 141049, at *3 (Tenn. Crim. App. Jan. 14, 2003)(concluding that the trial court erred in finding the defendant failed to establish a prima facie case because this was the "first challenge," and the defendant had not shown a "pattern" of discriminatory challenges). We emphasize, yet again, that the exclusion of a single juror of a particular race may be sufficient to constitute a prima facie case, Ellison, 841 S.W.2d at 827; Timothy Tyrone Sanders, 2005 WL 354100, at *4; Theddaeus Medford, 2003 WL 141049, at *3, and that a pattern is not required.

Regardless of the above error, the trial court required the State to articulate a race-neutral basis for each peremptory challenge and made an independent determination after each basis provided by the State in accord with the procedural dictates of Batson. Benjamin Blackwell v. State, No. W2001-02179-CCA-R3-PC, 2003 WL 402805, at *6 (Tenn. Crim. App. Feb. 12, 2003) (although trial court improperly required proof of pattern to find a prima facie case of discrimination no ineffective assistance of counsel because trial court also satisfied that State offered race-neutral explanation for the challenges). We also note the Defendant does not take issue with the process in which the trial court engaged in denying the Batson challenge. Accordingly, reversal and remand are unnecessary on this ground, and we will review the merits.

The Defendant makes very little argument in support of this issue and merely suggests generally that the trial court's rejection of his Batson challenge was clearly erroneous. In support, the Defendant casts doubt on the legitimacy of the State's articulated race-neutral basis by claiming each African American juror had a favorable bias *in support* of the State and was nonetheless dismissed *by the State*. At this juncture, the focus of our analysis is whether the State's articulated race-neutral grounds offered in support of their peremptory strikes were sufficient to rebut the Defendant's prima facie case of purposeful discrimination.

In this context, a neutral explanation means an explanation based on something other than the race of the juror. Hernandez v. New York, 500 U.S. at 360, 111 S.Ct. at 1866. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. Id. Indeed, "[w]hat Batson means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." Carroll, 34 S.W.3d at 320 (quoting Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995)) (upholding a challenge because a juror was non-assertive and failed to make eye contact). As outlined above, the State's articulated basis for striking Juror Two was because she had been charged with a crime she believed she did not commit and

because she was "unclear" whether she could be fair.  The State's articulated basis for striking Juror One was because she stated that she had "family members, including her brother who had been charged with robberies" for which they had gone to prison.  Courts have consistently held that a family member's criminal history is an acceptable, race-neutral reason for striking a prospective juror.  See e.g. Broom v. Denney, 659 F.3d 658, 661 (8th Cir. 2011) (noting that the incarceration of a family member is a legitimate race-neutral reason justifying the use of a peremptory strike); United States v. Hendrix, 509 F.3d 362, 370-71 (7th Cir. 2007) ("legitimate and race-neutral" for prosecutor to strike prospective black jurors who had relatives in prison because jurors with relatives in prison may sympathize with the defendant or have feelings of animosity against the prosecution); see also United States v. Alvarez-Ulloa, 784 F.3d 558, 566 (9th Cir. 2015) (striking juror based on her negative experience with law enforcement is race-neutral because it exhibits a potential bias against the government and in favor a criminal defendant).  The State's articulated explanations in support of their peremptory challenges were not based on the race of the jurors and therefore were sufficient to rebut the Defendant's prima facie case of purposeful discrimination.

Finally, to the extent the Defendant attempts to argue the State's articulated basis in support of its peremptory challenges were otherwise pretextual, we note that the Defendant did not respond or object in the trial court after the State offered its race neutral basis for each strike nor did he elaborate further on this issue in his motion for new trial.  The Defendant also failed to offer any statistics regarding the racial make-up of the jury venire or a comparative juror analysis.  Accordingly, we conclude the trial court's denial of the Batson challenge was not clearly erroneous, and the Defendant is not entitled to relief.

**II.  Alleged Prosecutorial Misconduct.**  During its rebuttal closing argument, the State said, "I'm going to skip to vandalism.  I don't know what trial counsel is trying to say.  Again, I'm going back to smoke and mirrors[.]"  The Defendant specifically contends that he is entitled to reversal because "the State's arguments could have improperly implied to the jury that trial counsel was misrepresenting facts[.]"  The Defendant further contends that the State engaged in improper vouching by saying the victim "had no reason to lie" about the money he paid to repair his truck.  The State maintains the challenged statements were an appropriate response to the defense argument and not a personal opinion about the veracity of the evidence.  The State additionally contends use of the phrase "smoke and mirrors," suggested that trial counsel sought to distract from the facts indicating the Defendant's guilt by focusing on unimportant details.

The Tennessee Supreme Court has repeatedly noted that "[c]losing argument is a valuable privilege that should not be unduly restricted."  State v. Stephenson, 195 S.W.3d 574, 603 (Tenn. 2006) (citing State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001)).  The trial court has substantial discretion in controlling the course of arguments and will not be

reversed unless there is an abuse of that discretion. Id. In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it affected the outcome of the trial to the prejudice of the defendant. Id. (citing Terry v. State, 46 S. W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" State v. Gann, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)). An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice. State v. Thacker, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998); State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996). This court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted).

In addition, there are five general areas of potential prosecutorial misconduct related to closing argument:

> (1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant.
> (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
> (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
> (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public

knowledge.

State v. Sexton, 368 S.W.3d 371, 419 (Tenn. 2012), as corrected (Oct. 10, 2012) (citing State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)).

A summary of the defense closing argument is necessary to provide context. Defense counsel began with a reference to a photograph of the victim's driveway that had been offered as an exhibit at trial to illustrate the length of the cars in the driveway. Defense counsel stated the exact length of both cars and, with the aid of a tape measure, began to illustrate the distance in court. The State objected and a lengthy bench conference ensued. The State argued defense counsel was arguing facts not in evidence because the victim testified the cars in the photograph were not in the driveway at the time of the offense, and there was no testimony regarding the length of the cars in the photograph. The trial court agreed with the State and prohibited defense counsel from using the tape measure in his closing. However, the court allowed defense counsel to utilize the cars in the photographs to establish distance. After argument resumed, defense counsel theorized from the relative sizes of the cars in the driveway that the victim could not have been in possession of his truck as required to find the Defendant guilty of robbery or carjacking. Defense counsel continued to emphasize the distance between the victim, the front door, and his truck at the time of the offense. Defense counsel also argued the victim's testimony placing himself at the door of the truck did not meet the legal definition of aggravated assault by use of the truck as a deadly weapon. In support, defense counsel pointed to inconsistencies in the testimony of the witnesses who observed the initial commotion in the victim's driveway. Defense counsel then focused his argument on the photographs of the truck at the crash scene and observed, "you can see the grill[e] missing[.]" Defense counsel says, "Does that look a little bit different to you actually out on the scene? Grille there. Damage over here on this side, tree right here. Look at these photographs side by side. . . . This picture right here, the passenger side light is busted out. This picture right here taken at the scene not. I don't know why that is, folks. You don't know why that is. Minor discrepancy?"

During the State's rebuttal closing argument, the following exchange occurred:

So, perhaps these witnesses' stories vary slightly in details. Okay. I would submit that two of the witnesses were in a car. They saw things from a different perspective from each other, from Mr. Velasquez and his daughter.

They didn't see every part of it. They were very clear that at points the cars were moving because the traffic was flowing down Stones River Road, so they didn't see everything that was happening.

. . . .

If [Defense Counsel] wants to talk about the tiny details here and there that are different because different people saw it from a different perspective or remember it in a slightly different way - - I would submit if all 12 of you watched a similar thing happen, every one of you would tell that story just a little bit differently. But to focus in [sic] on those small details that might be different is what we often, in the business, refer to as *smoke and mirrors*.

….

So, to argue a distance that, I would submit to you, Ladies and Gentlemen, was not the proof in evidence is *smoke and mirrors* in this case. And he had the intent to permanently deprive the victim of his car.

. . . .

I want to skip vandalism. I don't know what Defense Counsel was trying to say. Again, I'm going to go back to the *smoke and mirrors* about the grille being on the front of the …truck.

Defense counsel then lodged an objection, and the following bench conference was held.

[DEFENSE COUNSEL] Your Honor, I object to the State's implication to this jury that I am somehow . . . basically have lied to them, tried to – the *smoke and mirrors* and everything, I let it go the first time. Now, we have got it again. I object to the reference to me in that way.

THE COURT: Thank you, [State].

[STATE]: I never said that he lied. What I'm saying is that he is skewing the facts in his favor. This is argument, Your Honor.

THE COURT: Thank you.   [Defense Counsel]?

[DEFENSE COUNSEL]:  Judge, that's like saying I didn't say you lied, I just said you didn't tell the truth. I mean, she's making an implication and impugning my integrity like I have gotten up here and done something wrong for this jury. And that's improper argument.

- 13 -

[THE COURT]:  Thank you.  I would agree if she had said that you had lied.  But she didn't say you lied.  She said she didn't know what you were trying to say.  And, so, I don't find that to be an aspersion on your character or on what was stated to the jury.  I overrule the objection, would allow her to continue the argument.  Thank you.

. . . .

[THE STATE]  But the victims testified when they had to have this damage replaced, it cost them $4,000.  That is over $1,000, and less than $10,000.  They have no reason to lie about what it cost them to get their truck fixed.

[DEFENSE COUNSEL]:  Objection, Your Honor.  That's improper vouching for a witness.

[THE COURT]:  Thank you.  Note your statement for the record and allow [the State] to go forward.  Go ahead, [State].

In review of this issue, we are mindful that a prosecutor's role is "to refrain from improper methods calculated to produce a wrongful conviction...." United States v. Young, 470 U.S. 1, 7, 105 S.Ct. 1038, 1042 (1985) (citing Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633 (1935)).  However, the adversary system permits the prosecutor to "prosecute with earnestness and vigor" id., and "while [she] may strike hard blows, [she] is not at liberty to strike foul ones." Id.  Additionally, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.  To help resolve this problem, courts have invoked what is sometimes called the "invited response" or "invited reply" rule. Id., 470 U.S. at 11, 105 S.Ct. at 1044.  The "invited response" doctrine should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process. Rather, the issue is whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant. Id., 470 U.S. at 12, 105 S.Ct. at 1044-45.

We acknowledge defense counsel's concern regarding the use of the phrase "smoke and mirrors" or "smoke screen" or variations thereof because it may imply that counsel had not based his argument on fact or reason but instead intended to mislead the jury by means of an artfully deceptive argument.  This court has recognized that the "prosecution is not permitted to reflect unfavorably upon defense counsel, or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App.

- 14 -

2007) (citations omitted). However, it is permissible for the prosecutor to comment during closing argument on the strength and believability of the defense theories when the defendants had, through their own witnesses and through cross-examination, offered various explanations, implied and expressed, as to the State's proof. See State v. Hall, 976 S.W.2d 121, 157-58 (Tenn. 1998) (finding no abuse of discretion in the trial court's overruling the defendant's objections to the State's closing comments such as "'that's not a reasonable alternative,'" and "'such a ridiculous position'").

Applying the above law to this case, we are unable to conclude that the State's characterization of the defense's case as "smoke and mirrors" rises to the level of misconduct to require reversal of the Defendant's convictions. State v. Jessie Dotson, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *76 (Tenn. Crim. App. June 25, 2013), aff'd, 450 S.W.3d 1 (Tenn. 2014); State v. Demario Quintez Driver, No. M2021-00538-CCA-R3-CD, 2022 WL 1284978, at *7 (Tenn. Crim. App. Apr. 29, 2022), appeal denied (Sept. 29, 2022). A close review of the record shows that each reference was in direct response to a portion of the defense closing argument and more of a criticism of the strength of the defense theory, rather than a personal attack on the character of defense counsel. See State v. Brandon Robert Vandenburg, No. M2017-01882-CCA-R3-CD, 2019 WL 3720892, at *52-53 (Tenn. Crim. App. Aug. 8, 2019) (concluding that the prosecutor's comments during rebuttal argument addressing the defense's arguments as "red herrings" did not breach a clear and unequivocal rule of law to rise to the level of plain error when the comments were in response to defense counsel's statements during closing arguments); State v. Lance Burton, No. W2009-01875-CCA-R3-CD, 2010 WL 3244949, at *5 (Tenn. Crim. App. Aug. 17, 2010) (addressing the prosecutor's comments referencing defense counsel's arguments as "defense attorney tricks, defense attorney strategy"). Moreover, even if the State's multiple references to "smoke and mirrors" did constitute error, the proof at trial showed that the Defendant essentially confessed to stealing the victim's truck, and the Defendant's phone was found inside the victim's truck. Because there was overwhelming proof of the Defendant's guilt, any error in the State's improper reference to "smoke and mirrors" cannot be said to have affected the outcome of the case to the prejudice of the Defendant. Accordingly, the Defendant is not entitled to relief.

The Defendant next argues that the State engaged in improper vouching by saying the victim "had no reason to lie" about the money he paid to repair his truck. Certainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness or as to the accused's guilt or innocence. State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (citing State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989)). In this context, "expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which [she] argues." Goltz, 111 S.W.3d at 6 (citing Standards § 5.8(b) Commentary b). The "witnesses must stand on their own,"

and this prohibition "prevents the advocate from personally endorsing or vouching for" a witness, ensuring that "the cause ... turn[s] on the evidence, not on the standing of the advocate." Id. Here, we understand the Defendant's position, because the jury very well could have attributed undue credibility to the victim-witnesses based on the State's comment. However, based on our previous assessment of the proof, we are unable to conclude that the isolated improper comment affected the outcome of the case to the prejudice of the Defendant. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE